# BARTKUS *v.* ILLINOIS.

No. 1.   Argued November 19, 1957.—Affirmed by an equally divided
Court January 6, 1958.—Rehearing granted, judgment vacated
and case restored to calendar for reargument May 26,
1958.—Reargued  October  21–22,  1958.—Decided
March  30,  1959.

*Walter T. Fisher,* acting under appointment by the
Court, 352 U. S. 958, reargued the cause and filed a brief
on rehearing for petitioner.

*William C. Wines,* Assistant Attorney General of Illi-
nois, reargued the cause for respondent.   With him on a
brief on rehearing was *Latham Castle,* Attorney General.

MR. JUSTICE FRANKFURTER delivered the opinion of the
Court.

Petitioner was tried in the Federal District Court for
the Northern District of Illinois on December 18, 1953,
for robbery of a federally insured savings and loan asso-

ciation, the General Savings and Loan Association of Cicero, Illinois, in violation of 18 U. S. C. § 2113. The case was tried to a jury and resulted in an acquittal. On January 8, 1954, an Illinois grand jury indicted Bartkus. The facts recited in the Illinois indictment were substantially identical to those contained in the prior federal indictment. The Illinois indictment charged that these facts constituted a violation of Illinois Revised Statutes, 1951, c. 38, § 501, a robbery statute. Bartkus was tried and convicted in the Criminal Court of Cook County and was sentenced to life imprisonment under the Illinois Habitual Criminal Statute. Ill. Rev. Stat., 1951, c. 38, § 602.

The Illinois trial court considered and rejected petitioner's plea of *autrefois acquit*. That ruling and other alleged errors were challenged before the Illinois Supreme Court which affirmed the conviction. 7 Ill. 2d 138, 130 N. E. 2d 187. We granted certiorari because the petition raised a substantial question concerning the application of the Fourteenth Amendment. 352 U. S. 907, 958. On January 6, 1958, the judgment below was affirmed by an equally divided Court. 355 U. S. 281. On May 26, 1958, the Court granted a petition for rehearing, vacated the judgment entered January 6, 1958, and restored the case to the calendar for reargument. 356 U. S. 969.

The state and federal prosecutions were separately conducted. It is true that the agent of the Federal Bureau of Investigation who had conducted the investigation on behalf of the Federal Government turned over to the Illinois prosecuting officials all the evidence he had gathered against the petitioner. Concededly, some of that evidence had been gathered after acquittal in the federal court. The only other connection between the two trials is to be found in a suggestion that the federal sentencing of the accomplices who testified against petitioner in both

trials was purposely continued by the federal court until after they testified in the state trial. The record establishes that the prosecution was undertaken by state prosecuting officials within their discretionary responsibility and on the basis of evidence that conduct contrary to the penal code of Illinois had occurred within their jurisdiction. It establishes also that federal officials acted in cooperation with state authorities, as is the conventional practice between the two sets of prosecutors throughout the country.[1] It does not support the claim that the State of Illinois in bringing its prosecution was merely a tool of the federal authorities, who thereby avoided the prohibition of the Fifth Amendment against a retrial of

---

[1] See Proceedings of the Attorney General's Conference on Crime (1934). At the conclusion of the state trial of Bartkus, State's Attorney Gutknecht thus reviewed the cooperation between federal and state officials:

"We have had a number of cases where the state's attorney's office have been cooperating very well with the federal authorities, particularly in the narcotics cases, because in that connection the federal government should have the first authority in handling them because narcotics is a nation-wide criminal organization, and so when I see people going through this town and criticising the County of Cook and the City of Chicago, because of the police, the state's attorney and the judges cooperating with the federal authorities, and giving that as proof of the fact that since we don't take the lead we must be negligent in our duties, I am particularly glad to see a case where the federal authorities came to the state's attorney.

"We are cooperating with the federal authorities and they are cooperating with us, and these statements in this city to the effect that the fact that the federal authorities are in the county is a sign of breakdown in law enforcement in Cook County is utter nonsense.

"The federal authorities have duties and we have duties. We are doing our duty and this is an illustration of it, and we are glad to continue to cooperate with the federal authorities. Give them the first play where it is their duty, as in narcotics, and we take over where our duty calls for us to carry the burden. . . ."

a federal prosecution after an acquittal. It does not sustain a conclusion that the state prosecution was a sham and a cover for a federal prosecution, and thereby in essential fact another federal prosecution.

Since the new prosecution was by Illinois, and not by the Federal Government, the claim of unconstitutionality must rest upon the Due Process Clause of the Fourteenth Amendment. Prior cases in this Court relating to successive state and federal prosecutions have been concerned with the Fifth Amendment, and the scope of its proscription of second prosecutions by the Federal Government, not with the Fourteenth Amendment's effect on state action. We are now called upon to draw on the considerations which have guided the Court in applying the limitations of the Fourteenth Amendment on state powers. We have held from the beginning and uniformly that the Due Process Clause of the Fourteenth Amendment does not apply to the States any of the provisions of the first eight amendments as such.[2] The relevant historical materials have been canvassed by this Court and by legal scholars.[3] These materials demonstrate conclusively that Congress and the members of the legislatures of the ratifying States did not contemplate that the Fourteenth Amendment was a short-hand incorporation of the first eight amendments making them applicable as explicit restrictions upon the States.

Evidencing the interpretation by both Congress and the States of the Fourteenth Amendment is a comparison of the constitutions of the ratifying States with the Federal

[2] *Hurtado* v. *California,* 110 U. S. 516; *In re Kemmler,* 136 U. S. 436; *Maxwell* v. *Dow,* 176 U. S. 581; *Twining* v. *New Jersey,* 211 U. S. 78; *Palko* v. *Connecticut,* 302 U. S. 319; *Adamson* v. *California,* 332 U. S. 46.

[3] Fairman, Does the Fourteenth Amendment Incorporate the Bill of Rights? The Original Understanding, 2 Stan. L. Rev. 5.

Constitution. Having regard only to the grand jury guarantee of the Fifth Amendment, the criminal jury guarantee of the Sixth Amendment, and the civil jury guarantee of the Seventh Amendment, it is apparent that if the first eight amendments were being applied verbatim to the States, ten of the thirty ratifying States would have impliedly been imposing upon themselves constitutional requirements on vital issues of state policies contrary to those present in their own constitutions.[4] Or, to approach the matter in a different way, they would be covertly altering provisions of their own constitutions in disregard of the amendment procedures required by those constitutions. Five other States would have been undertaking procedures not in conflict with but not required by their constitutions. Thus only one-half, or fifteen, of the ratifying States had constitutions in explicit accord with these provisions of the Fifth, Sixth, and Seventh Amendments. Of these fifteen, four made alterations in their constitutions by 1875 which brought them into important conflict with one or more of these provisions of the Federal Constitution. One of the States whose constitution had not included any provision on one of the three procedures under investigation adopted a provision in 1890 which was inconsistent with the Federal Constitution. And so by 1890 only eleven of the thirty ratifying States were in explicit accord with these provisions of the first eight amendments to the Federal Constitution. Four were silent as to one or more of the provisions and fifteen were in open conflict with these same provisions.[5]

---

[4] See Appendix, *post*, p. 140, in which are detailed the provisions in the constitutions of the ratifying States and of the States later admitted to the Union which correspond to these federal guarantees in the Fifth, Sixth, and Seventh Amendments.

[5] Cf. *Fox* v. *Ohio*, 5 How. 410, 435, in which, in ruling that the Fifth Amendment was not to be read as applying to the States,

Similarly imposing evidence of the understanding of the Due Process Clause is supplied by the history of the admission of the twelve States entering the Union after the ratification of the Fourteenth Amendment. In the case of each, Congress required that the State's constitution be "not repugnant" to the Constitution of the United States.[6] Not one of the constitutions of the twelve States contains all three of the procedures relating to grand jury, criminal jury, and civil jury. In fact all twelve have provisions obviously different from the requirements of the Fifth, Sixth, or Seventh Amendments. And yet, in the case of each admission, either the President of the United States, or Congress, or both have found that the constitution was in conformity with the Enabling Act and the Constitution of the United States.[7] Nor is there warrant to believe that the States in adopting constitutions with the specific purpose of complying with the requisites of admission were in fact evading the demands of the Constitution of the United States.

Surely this compels the conclusion that Congress and the States have always believed that the Due Process Clause brought into play a basis of restrictions upon the States other than the undisclosed incorporation of the original eight amendments. In *Hurtado* v. *California,* 110 U. S. 516, this Court considered due process in its historical setting, reviewed its development as a concept in Anglo-American law from the time of the Magna Carta until the time of the adoption of the Fourteenth

---

Mr. Justice Daniel wrote: "it is neither probable nor credible that the States should have anxiously insisted to ingraft upon the federal constitution restrictions upon their own authority . . . ."

[6] See, *e. g.,* 36 Stat. 569.

[7] See, *e. g.,* 37 Stat. 1728.

Amendment and concluded that it was intended to be a flexible concept, responsive to thought and experience—experience which is reflected in a solid body of judicial opinion, all manifesting deep convictions to be unfolded by a process of "inclusion and exclusion." *Davidson* v. *New Orleans,* 96 U. S. 97, 104. Time and again this Court has attempted by general phrases not to define but to indicate the purport of due process and to adumbrate the continuing adjudicatory process in its application. The statement by Mr. Justice Cardozo in *Palko* v. *Connecticut,* 302 U. S. 319, has especially commended itself and been frequently cited in later opinions.[8] Referring to specific situations, he wrote:

> "In these and other situations immunities that are valid as against the federal government by force of the specific pledges of particular amendments have been found to be implicit in the concept of ordered liberty, and thus, through the Fourteenth Amendment, become valid as against the states." 302 U. S., at 324–325.

About the meaning of due process, in broad perspective unrelated to the first eight amendments, he suggested that it prohibited to the States only those practices "repugnant to the conscience of mankind." 302 U. S., at 323. In applying these phrases in *Palko,* the Court ruled that, while at some point the cruelty of harassment by multiple prosecutions by a State would offend due process, the specific limitation imposed on the Federal Government by the Double Jeopardy Clause of the Fifth Amendment did not bind the States.

Decisions of this Court concerning the application of the Due Process Clause reveal the necessary process of

---

[8] See, *e. g., Leland* v. *Oregon,* 343 U. S. 790, 801; *Rochin* v. *California,* 342 U. S. 165, 169; *Bute* v. *Illinois,* 333 U. S. 640, 659.

balancing relevant and conflicting factors in the judicial application of that Clause. In *Chambers* v. *Florida,* 309 U. S. 227, we held that a state conviction of murder was void because it was based upon a confession elicited by applying third-degree methods to the defendant. But we have also held that a second execution necessitated by a mechanical failure in the first attempt was not in violation of due process. *Louisiana ex rel. Francis* v. *Resweber,* 329 U. S. 459. Decisions under the Due Process Clause require close and perceptive inquiry into fundamental principles of our society. The Anglo-American system of law is based not upon transcendental revelation but upon the conscience of society ascertained as best it may be by a tribunal disciplined for the task and environed by the best safeguards for disinterestedness and detachment.

Constitutional challenge to successive state and federal prosecutions based upon the same transaction or conduct is not a new question before the Court though it has now been presented with conspicuous ability.[9] The Fifth

---

[9] It has not been deemed relevant to discussion of our problem to consider dubious English precedents concerning the effect of foreign criminal judgments on the ability of English courts to try charges arising out of the same conduct—dubious in part because of the confused and inadequate reporting of the case on which much is based, see the varying versions of *Rex* v. *Hutchinson* found in *Beak* v. *Thyrwhit,* 3 Mod. 194, 87 Eng. Rep. 124 (reported as *Beake* v. *Tyrrell* in 1 Show. 6, 89 Eng. Rep. 411, and as *Beake* v. *Tirrell* in Comberbach 120, 90 Eng. Rep. 379), *Burrows* v. *Jemino,* 2 Strange 733, 93 Eng. Rep. 815 (reported as *Burroughs* v. *Jamineau* in Mos. 1, 25 Eng. Rep. 235, as *Burrows* v. *Jemineau* in Sel. Cas. 70, 25 Eng. Rep. 228, as *Burrows* v. *Jemineau* in 2 Eq. Ca. Abr. 476, and as *Burrows* v. *Jemino* in 22 Eng. Rep. 443), and explained in *Gage* v. *Bulkeley,* Ridg. Cas. 263, 27 Eng. Rep. 824. Such precedents are dubious also because they reflect a power of discretion vested in English judges not relevant to the constitutional law of our federalism.

Amendment's proscription of double jeopardy has been invoked and rejected in over twenty cases of real or hypothetical successive state and federal prosecution cases before this Court. While *United States* v. *Lanza*, 260 U. S. 377, was the first case in which we squarely held valid a federal prosecution arising out of the same facts which had been the basis of a state conviction, the validity of such a prosecution by the Federal Government has not been questioned by this Court since the opinion in *Fox* v. *Ohio*, 5 How. 410, more than one hundred years ago.

In *Fox* v. *Ohio* argument was made to the Supreme Court that an Ohio conviction for uttering counterfeit money was invalid. This assertion of invalidity was based in large part upon the argument that since Congress had imposed federal sanctions for the counterfeiting of money, a failure to find that the Supremacy Clause precluded the States from punishing related conduct would expose an individual to double punishment. Mr. Justice Daniel, writing for the Court (with Mr. Justice McLean dissenting), recognized as true that there was a possibility of double punishment, but denied that from this flowed a finding of pre-emption, concluding instead that both the Federal and State Governments retained the power to impose criminal sanctions, the United States because of its interest in protecting the purity of its currency, the States because of their interest in protecting their citizens against fraud.

In some eight state cases decided prior to *Fox* the courts of seven States had discussed the validity of successive state and federal prosecutions. In three, Missouri,[10] North Carolina,[11] and Virginia,[12] it had been said that there would be no plea in bar to prevent the second prosecution.

---

[10] *Mattison* v. *State*, 3 Mo. *421.

[11] *State* v. *Brown*, 2 N. C. *100.

[12] *Hendrick* v. *Commonwealth*, 5 Leigh (Va.) 707.

Discussions in two cases in South Carolina were in conflict—the earlier opinion [13] expressing belief that there would be a bar, the later,[14] without acknowledging disagreement with the first, denying the availability of a plea in bar. In three other States, Vermont,[15] Massachusetts,[16] and Michigan,[17] courts had stated that a prosecution by one government would bar prosecution by another government of a crime based on the same conduct. The persuasiveness of the Massachusetts and Michigan decisions is somewhat impaired by the precedent upon which they relied in their reasoning. In the Supreme Court case cited in the Massachusetts and Michigan cases, *Houston* v. *Moore,* 5 Wheat. 1, there is some language to the effect that there would be a bar to a second prosecution by a different government. 5 Wheat., at 31. But that language by Mr. Justice Washington reflected his belief that the state statute imposed state sanctions for violation of a federal criminal law. 5 Wheat., at 28. As he viewed the matter, the two trials would not be of similar crimes arising out of the same conduct; they would be of the same crime. Mr. Justice Johnson agreed that if the state courts had become empowered to try the defendant for the federal offense, then such a state trial would bar a federal prosecution. 5 Wheat., at 35. Thus *Houston* v. *Moore* can be cited only for the presence of a bar in a case in which the second trial is for a violation of the very statute whose violation by the same conduct has already been tried in the courts of another government empowered to try that question.[18]

---

[13] *State* v. *Antonio,* 2 Treadway's Const. Rep. (S. C.) 776.

[14] *State* v. *Tutt,* 2 Bailey (S. C.) 44.

[15] *State* v. *Randall,* 2 Aikens (Vt.) 89.

[16] *Commonwealth* v. *Fuller,* 8 Metcalf (Mass.) 313.

[17] *Harlan* v. *People,* 1 Douglass' Rep. (Mich.) 207.

[18] Mr. Justice Story's dissenting opinion in *Houston* v. *Moore,* 5 Wheat. 1, 47, displays dislike of the possibility of multiple prosecu-

The significance of this historical background of decisions prior to *Fox* is that it was, taking a position most favorable to advocates of the bars of *autrefois acquit* and *autrefois convict* in cases like that before this Court, totally inconclusive. Conflicting opinions concerning the applicability of the plea in bar may manifest conflict in conscience. They certainly do not manifest agreement that to permit successive state and federal prosecutions for different crimes arising from the same acts would be repugnant to those standards of outlawry which offend the conception of due process outlined in *Palko*. (It is worth noting that *Palko* sustained a first degree murder conviction returned in a second trial after an appeal by the State from an acquittal of first degree murder.) The early state decisions had clarified the issue by stating the opposing arguments. The process of this Court's response to the Fifth Amendment challenge was begun in *Fox* v. *Ohio,* continued in *United States* v. *Marigold,* 9 How. 560, and was completed in *Moore* v. *Illinois,* 14 How. 13. Mr. Justice Grier, writing for the Court in *Moore* v. *Illinois,* gave definitive statement to the rule which had been evolving:

> "An offence, in its legal signification, means the transgression of a law." 14 How., at 19.
>
> "Every citizen of the United States is also a citizen of a State or territory. He may be said to owe allegiance to two sovereigns, and may be liable to punishment for an infraction of the laws of either. The same act may be an offence or transgression of the laws of both." 14 How., at 20.
>
> "That either or both may (if they see fit) punish such an offender, cannot be doubted. Yet it cannot

tions, *id.,* at 72, but also suggests the possibility that under some circumstances a state acquittal might not bar a federal prosecution, *id.,* at 74–75.

be truly averred that the offender has been twice punished for the same offence; but only that by one act he has committed two offences, for each of which he is justly punishable. He could not plead the punishment by one in bar to a conviction by the other." *Ibid.*

In a dozen cases decided by this Court between *Moore v. Illinois* and *United States v. Lanza* this Court had occasion to reaffirm the principle first enunciated in *Fox v. Ohio*.[19] Since *Lanza* the Court has five times repeated the rule that successive state and federal prosecutions are not in violation of the Fifth Amendment.[20] Indeed Mr. Justice Holmes once wrote of this rule that it "is too plain to need more than statement."[21] One of the post-*Lanza* cases, *Jerome v. United States,* 318 U. S. 101, involved the same federal statute under which Bartkus was indicted and in *Jerome* this Court recognized that successive state and federal prosecutions were thereby made possible because all States had general robbery statutes. Nonetheless, a unanimous Court, as recently as 1943, accepted as unquestioned constitutional law that such successive prosecutions would not violate the proscription of double

[19] *United States v. Cruikshank,* 92 U. S. 542; *Coleman v. Tennessee,* 97 U. S. 509; *Ex parte Siebold,* 100 U. S. 371; *United States v. Arjona,* 120 U. S. 479; *Cross v. North Carolina,* 132 U. S. 131; *In re Loney,* 134 U. S. 372; *Pettibone v. United States,* 148 U. S. 197; *Crossley v. California,* 168 U. S. 640; *Sexton v. California,* 189 U. S. 319; *Matter of Heff,* 197 U. S. 488; *Grafton v. United States,* 206 U. S. 333; *Ponzi v. Fessenden,* 258 U. S. 254.

[20] *Hebert v. Louisiana,* 272 U. S. 312; *Westfall v. United States,* 274 U. S. 256; *Puerto Rico v. The Shell Co.,* 302 U. S. 253; *Jerome v. United States,* 318 U. S. 101; *Screws v. United States,* 325 U. S. 91.

[21] *Westfall v. United States,* 274 U. S. 256, 258.

jeopardy included in the Fifth Amendment. 318 U. S., at 105.[22]

The lower federal courts have of course been in accord with this Court.[23] Although some can be cited only in

[22] In a chapter in Handbook on Interstate Crime Control, a book prepared in 1938 by the Interstate Commission on Crime, Gordon Dean, then Special Executive Assistant to the Attorney General of the United States, wrote:

"Mention should also be made of the National Bank Robbery statute. This statute punishes robberies of national banks, banks which are members of the Federal Reserve System, and banks the funds of which are insured by the Federal Deposit Insurance Corporation. And here again there has been no usurpation by the federal government. The states still may prosecute any robbery of any bank within their jurisdiction, and they frequently do. There have been several cases in the last few years where men have been convicted both under the state and federal law for robbing the same bank. In fact, there have been cases where men have been tried under the law of one jurisdiction, acquitted, and on the same facts tried under the law of the other sovereignty and convicted. Bank robbers know today that 'flight,' their most valuable weapon, has, under the operation of the National Bank Robbery statute, proved quite impotent. The bank robbery rate has been cut in half, and there has been a fine relation between state and federal agencies in the apprehension and trial of bank robbers." *Id.*, at 114.

[23] *McKinney* v. *Landon,* 209 F. 300 (C. A. 8th Cir.); *Morris* v. *United States,* 229 F. 516 (C. A. 8th Cir.); *Vandell* v. *United States,* 6 F. 2d 188 (C. A. 2d Cir.); *United States* v. *Levine,* 129 F. 2d 745 (C. A. 2d Cir.); *Serio* v. *United States,* 203 F. 2d 576 (C. A. 5th Cir.); *Jolley* v. *United States,* 232 F. 2d 83 (C. A. 5th Cir.); *Smith* v. *United States,* 243 F. 2d 877 (C. A. 6th Cir.); *Rios* v. *United States,* 256 F. 2d 173 (C. A. 9th Cir.); *United States* v. *Amy,* 24 Fed. Cas. No. 14,445 (C. C. Va.); *United States* v. *Given,* 25 Fed. Cas. No. 15,211 (C. C. Del.); *United States* v. *Barnhart,* 22 F. 285 (C. C. Ore.); *United States* v. *Palan,* 167 F. 991 (C. C. S. D. N. Y.); *United States* v. *Wells,* 28 Fed. Cas. No. 16,665' (D. C. Minn.); *United States* v. *Casey,* 247 F. 362 (D. C. S. D. Ohio); *United States* v. *Holt,* 270 F. 639 (D. C. N. Dak.); *In re*

that they follow the decisions of this Court, others manifest reflection upon the issues involved and express reasoned approval of the two-sovereignty principle. In *United States* v. *Barnhart,* 22 F. 285, the Oregon Circuit Court was presented with a case just the obverse of the present one: the prior trial and acquittal was by a state court; the subsequent trial was by a federal court. The Circuit Court rejected defendant's plea of *autrefois acquit,* saying that the hardship of the second trial might operate to persuade against the bringing of a subsequent prosecution but could not bar it.

The experience of state courts in dealing with successive prosecutions by different governments is obviously also relevant in considering whether or not the Illinois prosecution of Bartkus violated due process of law. Of the twenty-eight States which have considered the validity of successive state and federal prosecutions as against a challenge of violation of either a state constitutional double-jeopardy provision or a common-law evidentiary rule of *autrefois acquit* and *autrefois convict,* twenty-seven have refused to rule that the second prose-

*Morgan,* 80 F. Supp. 810 (D. C. N. D. Iowa); *United States* v. *Mandile,* 119 F. Supp. 266 (D. C. E. D. N. Y.). Of the many prohibition cases in the lower federal courts only *United States* v. *Holt* has been included; its inclusion is meant to represent that body of cases and is particularly justified by its careful reasoning concerning the entire question of dual sovereignties and double jeopardy. It is believed that the list contains most of the nonprohibition cases in the lower federal courts discussing and favoring the rule that trial in one jurisdiction does not bar prosecution in another for a different offense arising from the same act. Three lower federal court cases have been found questioning the validity of the rule: *Ex parte Houghton,* 7 F. 657, 8 F. 897 (D. C. Vt.); *In re Stubbs,* 133 F. 1012 (C. C. W. D. Wash.); *United States* v. *Candelaria,* 131 F. Supp. 797 (D. C. S. D. Cal.).

cution was or would be barred.[24]   These States were not bound to follow this Court and its interpretation of the Fifth Amendment.   The rules, constitutional, statutory, or common law which bound them, drew upon the same

---

[24]   STATES DENYING THE BAR.

Arizona.  *Henderson* v. *State,* 30 Ariz. 113, 244 P. 1020 (despite a limited statutory bar, holding successive federal and state prosecutions permitted where one is for possession and the other for transportation).

Arkansas.  *State* v. *Duncan,* 221 Ark. 681, 255 S. W. 2d 430.

California.  *People* v. *McDonnell,* 80 Cal. 285, 22 P. 190; *People* v. *Candelaria,* 139 Cal. App. 2d 432, 294 P. 2d 120; *People* v. *Candelaria,* 153 Cal. App. 2d 879, 315 P. 2d 386 (these two *Candelaria* cases indicate that the California statutory bar, a statute of the kind discussed below, prevents a state robbery prosecution after a federal robbery prosecution, but not a state burglary prosecution in the same circumstances).

Georgia.  *Scheinfain* v. *Aldredge,* 191 Ga. 479, 12 S. E. 2d 868; *Bryson* v. *State,* 27 Ga. App. 230, 108 S. E. 63.

Illinois.  *Hoke* v. *People,* 122 Ill. 511, 13 N. E. 823.

Indiana.  *Heier* v. *State,* 191 Ind. 410, 133 N. E. 200; *Dashing* v. *State,* 78 Ind. 357.

Iowa.  *State* v. *Moore,* 143 Iowa 240, 121 N. W. 1052.

Kentucky.  *Hall* v. *Commonwealth,* 197 Ky. 179, 246 S. W. 441.

Louisiana.  *State* v. *Breaux,* 161 La. 368, 108 So. 773, aff'd *per cur.,* 273 U. S. 645.

Maine.  See *State* v. *Gauthier,* 12. Me. 522, 529–531, 118 A. 380, 383–385.

Massachusetts.  *Commonwealth* v. *Nickerson,* 236 Mass. 281, 128 N. E. 273.

Michigan.  *In re Illova,* 351 Mich. 204, 88 N. W. 2d 589.

Minnesota.  *State* v. *Holm,* 139 Minn. 267, 166 N. W. 181.

Missouri.  *In re January,* 295 Mo. 653, 246 S. W. 241.

New Hampshire.  *State* v. *Whittemore,* 50 N. H. 245.

New Jersey.  *State* v. *Cioffe,* 130 N. J. L. 160, 32 A. 2d 79.

New York.  *People* v. *Welch,* 141 N. Y. 266, 36 N. E. 328.

North Carolina.  See *State* v. *Brown,* 2 N. C. *100, 101.

Oregon.  *State* v. *Frach,* 162 Ore. 602, 94 P. 2d 143.

experience as did the Fifth Amendment, but were and are of separate and independent authority.

Not all of the state cases manifest careful reasoning, for in some of them the language concerning double jeopardy is but offhand dictum. But in an array of state cases there may be found full consideration of the arguments supporting and denying a bar to a second prosecution. These courts interpreted their rules as not proscribing a second prosecution where the first was by a different government and for violation of a different statute.

With this body of precedent as irrefutable evidence that state and federal courts have for years refused to bar a second trial even though there had been a prior trial by another government for a similar offense, it would be disregard of a long, unbroken, unquestioned course of impressive adjudication for the Court now to rule that due process compels such a bar. A practical justification for rejecting such a reading of due process also com-

Pennsylvania. See *Commonwealth ex rel. O'Brien v. Burke,* 171 Pa. Super. 273, 90 A. 2d 246.

South Carolina. *State v. Tutt,* 2 Bailey 44.

Tennessee. *State v. Rhodes,* 146 Tenn. 398, 242 S. W. 642; *State v. Rankin,* 4 Coldw. 145.

Vermont. *State v. O'Brien,* 106 Vt. 97, 170 A. 98.

Virginia. *Jett v. Commonwealth,* 18 Gratt. (59 Va.) 933.

Washington. *State v. Kenney,* 83 Wash. 441, 145 P. 450.

West Virginia. *State v. Holesapple,* 92 W. Va. 645, 115 S. E. 794. See *Moundsville v. Fountain,* 27 W. Va. 182, 197–198.

Wyoming: See *In re Murphy,* 5 Wyo. 297, 304–309, 40 P. 398, 399–401.

STATE RAISING THE BAR.

Florida. *Burrows v. Moran,* 81 Fla. 662, 89 So. 111 (this case may be limited to the interpretation given by the Florida court to the Eighteenth Amendment. See *Strobhar v. State,* 55 Fla. 167, 180–181, 47 So. 4, 9).

mends itself in aid of this interpretation of the Fourteenth Amendment. In *Screws* v. *United States,* 325 U. S. 91, defendants were tried and convicted in a federal court under federal statutes with maximum sentences of a year and two years respectively. But the state crime there involved was a capital offense. Were the federal prosecution of a comparatively minor offense to prevent state prosecution of so grave an infraction of state law, the result would be a shocking and untoward deprivation of the historic right and obligation of the States to maintain peace and order within their confines. It would be in derogation of our federal system to displace the reserved power of States over state offenses by reason of prosecution of minor federal offenses by federal authorities beyond the control of the States.[25]

Some recent suggestions that the Constitution was in reality a deft device for establishing a centralized government are not only without factual justification but fly in the face of history. It has more accurately been shown that the men who wrote the Constitution as well as the citizens of the member States of the Confederation were fearful of the power of centralized government and sought to limit its power. Mr. Justice Brandeis has written that separation of powers was adopted in the Constitution "not to promote efficiency but to preclude the exercise of arbitrary power."[26] Time has not lessened the concern of the Founders in devising a federal system which would likewise be a safeguard against arbitrary government.

---

[25] Illinois had an additional and unique interest in Bartkus beyond the commission of this particular crime. If Bartkus was guilty of the crime charged he would be an habitual offender in Illinois and subject to life imprisonment. The Illinois court sentenced Bartkus to life imprisonment on this ground.

[26] *Myers* v. *United States,* 272 U. S. 52, 240, 293 (dissenting opinion).

The greatest self-restraint is necessary when that federal system yields results with which a court is in little sympathy.

The entire history of litigation and contention over the question of the imposition of a bar to a second prosecution by a government other than the one first prosecuting is a manifestation of the evolutionary unfolding of law. Today a number of States have statutes which bar a second prosecution if the defendant has been once tried by another government for a similar offense.[27]  A study of the cases under the New York statute,[28] which is typical of these laws, demonstrates that the task of determining when the federal and state statutes are so much alike that a prosecution under the former bars a prosecution under the latter is a difficult one.[29]  The proper solution of that problem frequently depends upon a judgment of the gravamen of the state statute.  It depends also upon an understanding of the scope of the bar that has been historically granted in the State to prevent successive state prosecutions.  Both these problems are ones with which the States are obviously more competent to deal than is this Court.  Furthermore, the rules resulting will intimately affect the efforts of a State to develop a rational and just body of criminal law in the protection of its citizens.  We ought not to utilize the Fourteenth Amend-

[27] Some fifteen such statutes are listed in Tentative Draft No. 5 of the American Law Institute's Model Penal Code (1956), p. 61.

[28] N. Y. Penal Code § 33 and N. Y. Code Crim. Proc. § 139.

[29] *People ex rel. Liss* v. *Superintendent of Women's Prison*, 282 N. Y. 115, 25 N. E. 2d 869; *People* v. *Mangano*, 269 App. Div. 954, 57 N. Y. S. 2d 891 (2d Dept.) aff'd *sub nom. People* v. *Mignogna*, 296 N. Y. 1011, 73 N. E. 2d 583; *People* v. *Spitzer*, 148 Misc. 97, 266 N. Y. S. 522 (Sup. Ct.); *People* v. *Parker*, 175 Misc. 776, 25 N. Y. S. 2d 247 (Kings County Ct.); *People* v. *Eklof*, 179 Misc. 536, 41 N. Y. S. 2d 557 (Richmond County Ct.); *People* v. *Adamchesky*, 184 Misc. 769, 55 N. Y. S. 2d 90 (N. Y. County Ct.).

ment to interfere with this development. Finally, experience such as that of New York may give aid to Congress in its consideration of adoption of similar provisions in individual federal criminal statutes or in the federal criminal code.[30]

Precedent, experience, and reason alike support the conclusion that Alfonse Bartkus has not been deprived of due process of law by the State of Illinois.

*Affirmed.*

[For dissenting opinion of MR. JUSTICE BLACK, see *post,* p. 150.]

[For dissenting opinion of MR. JUSTICE BRENNAN, see *post,* p. 164.]

---

[30] In specific instances Congress has included provisions to prevent federal prosecution after a state prosecution based upon similar conduct. See, *e. g.,* 18 U. S. C. § 2117 (burglary of vehicle of transportation carrying interstate or foreign shipments).

# APPENDIX TO OPINION OF THE COURT.

[r] Year of ratification of the Fourteenth Amendment,
[c] Year of adoption of constitution in effect on date of ratification or admission.
[ad] Year of admission to the Union.

| | FIFTH AMENDMENT<br>"No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury . . . ." | SIXTH AMENDMENT<br>"In all criminal prosecutions the accused shall enjoy the right to a speedy and public trial, by an impartial jury . . . ." | SEVENTH AMENDMENT<br>"In suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved . . . ." |
|---|---|---|---|
| | | STATES LISTED IN PROCLAMATION OF RATIFICATION | |
| Connecticut.<br>1866.[r]<br>1818.[c] | Art. I, § 9, gives right to grand jury indictment only if crime is punishable by death or imprisonment for life. | Art. I, § 9, similar. | Art. I, § 21: "The right of trial by jury shall remain inviolate." |
| New Hampshire.<br>1866.[r]<br>1792.[c] | Silent. | Art. XVI guarantees jury trial only in capital cases. | Art. XX similar, but amendments to Part II, § 77, ratified in 1852, permitted trial by Justices of the Peace in cases under one hundred dollars. |
| Tennessee.<br>1866.[r]<br>1834.[c] | Art. I, § 14, similar. | Art. I, §§ 9, 14, similar. | Art. I, § 6, similar. |
| New Jersey.<br>1866.[r]<br>1844.[c] | Art. I, § 9, similar. | Art. I, § 8, similar. | Art. I, § 7, preserves jury right except that legislature may authorize trial by jury of six when the amount in controversy is less than fifty dollars. |

| | | | |
|---|---|---|---|
| Oregon. 1866.ʳ 1857.ᶜ | Silent. | Art. I, § 11, similar. | Art. I, § 18, similar. |
| Vermont. 1866.ʳ 1793.ᶜ | Silent. | Chap. I, Art. 10, similar. | Chap. I, Art. 12, similar. |
| New York. 1867.ʳ 1846.ᶜ | Art. I, § 6, similar. | Art. I, § 2, similar. | Art. I, § 2, similar. |
| Ohio. 1867.ʳ 1851.ᶜ | Art. I, § 10, similar. See Fairman, p. 97.* | Art. I, § 10, similar. | Art. I, § 5, similar. |
| Illinois. 1867.ʳ 1848.ᶜ | Art. XIII, § 10, similar. Constitution of 1870 provided that the grand jury could be abolished in all cases. Art. II, § 8. | Art. XIII, § 9, similar. | Art. XIII, § 6, similar. Constitution of 1870 provided that legislature could provide for jury of less than twelve in civil cases before Justices of the Peace. Art. II, § 5. |
| West Virginia. 1867. 1861-63.ᶜ | Art. II, § 1; similar. | Art. II, § 8, similar. | Art. II, § 7, similar. Constitution of 1872 provided that legislature could establish jury of six in trials before Justices of the Peace. Art. III, § 13. Such judges were given jurisdiction to try cases up to three hundred dollars. Art. VIII, § 28. |

*Fairman, Does the Fourteenth Amendment Incorporate the Bill of Rights? The Original Understanding, 2 Stan. L. Rev. 5 (hereinafter cited as Fairman).

| FIFTH AMENDMENT<br>"No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury . . . ." | SIXTH AMENDMENT<br>"In all criminal prosecutions the accused shall enjoy the right to a speedy and public trial, by an impartial jury . . . ." | SEVENTH AMENDMENT<br>"In suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved . . . ." |
|---|---|---|
| STATES LISTED IN PROCLAMATION OF RATIFICATION—Continued | | |
| Kansas.<br>1867.ʳ<br>1859.ᶜ<br><br>Silent. See Fairman, p. 101. | Bill of Rights, § 10, similar. | Bill of Rights, § 5, similar. |
| Maine.<br>1867.ʳ<br>1819.ᶜ<br><br>Art. I, § 7, similar. | Art. I, § 6, similar. | Art. I, § 20, similar. |
| Nevada.<br>1867.ʳ<br>1864.ᶜ<br><br>Art. I, § 8, similar. | Art. I, § 3, similar. | Art. I, § 3, provides for a three-fourths vote of the jury in civil cases. |
| Missouri.<br>1867.ʳ<br>1865.ᶜ<br><br>Art. I, § 24, similar. In the Constitution of 1875 it is provided that nine of the twelve men on the grand jury may indict. Art. II, § 28. | Art. I, § 18, similar. The Constitution of 1875 permits juries of less than twelve in courts not of record, Art. II, § 28, and does not specify the limits of the jurisdiction of such courts. | Art. I, § 17, similar. The Constitution of 1875 permits juries of less than twelve in courts not of record, Art. II, § 28, and does not specify the limits of the jurisdiction of such courts. |
| Indiana.<br>1867.ʳ<br>1851.ᶜ<br><br>Art. VII, § 17: "The General Assembly may modify or abolish the Grand Jury system." See Fairman, p. 106. | Art. I, § 13, similar. | Art. I, § 20, similar. |

| | | | |
|---|---|---|---|
| Minnesota. 1867.[r] 1857.[c] | Silent. | Art. I, § 6, similar. | Art. I, § 4, similar. But in 1890 the constitution was amended to permit the legislature to provide for a five-sixths verdict after not less than six hours' debate. |
| Rhode Island. 1867.[r] 1842.[c] | Art. I, § 7, similar. | Art. I, § 10, similar. | Art. I, § 15, similar. |
| Wisconsin. 1867.[r] 1848.[c] | Art. I, § 8, similar. In 1870 the constitution was amended to permit prosecutions without a grand jury indictment. Amendments, Art. I. See Fairman, pp. 110–111. | Art. I, § 7, similar. | Art. I, § 5, similar. |
| Pennsylvania. 1867.[r] 1838.[c] | Art. IX, § 10, similar. | Art. IX, § 9, similar. | Art. IX, § 6, similar. |
| Michigan. 1867.[r] 1850.[c] | Silent. See Fairman, pp. 115–116. | Art. VI, § 28, permits juries of less than twelve in courts not of record. The constitution does not specify the limits of the jurisdiction of such courts. | Art. VI, § 27, similar. |
| Massachusetts. 1867.[r] 1780.[c] | Silent. | First Part, Art. XII, restricts jury right to trial of cases involving "capital or infamous punishment." | First Part, Art. XV, similar. |

144

STATES LISTED IN PROCLAMATION OF RATIFICATION—Continued

| | FIFTH AMENDMENT<br>"No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury . . . ." | SIXTH AMENDMENT<br>"In all criminal prosecutions the accused shall enjoy the right to a speedy and public trial, by an impartial jury . . . ." | SEVENTH AMENDMENT<br>"In suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved . . . ." |
|---|---|---|---|
| Nebraska.<br>1867.[r]<br>1866–67.[c] | Art. I, § 8, similar. The Constitution of 1875 provided that the legislature could abolish the grand jury system. Art. I, § 10. See Fairman, pp. 123–124. | Art. I, § 7, similar. | Art. I, § 5, permits legislature to authorize juries of less than twelve in "inferior courts." In the Constitution of 1875 the provision was altered to read in "courts inferior to the district court." Art. I, § 6. County courts, which are such inferior tribunals, were given jurisdiction up to one thousand dollars by the Constitution of 1875. Art. VI, § 16. See Fairman, pp. 122–123. |
| Iowa.<br>1868.[r]<br>1857.[c] | Art. I, § 11, similar. An amendment in 1884 permitted prosecutions without indictment. | Art. I, § 10, similar. | Art. I, § 9, authorizes juries of less than twelve "in inferior courts." |
| Arkansas.<br>1868.[r]<br>1868.[c] | Art. I, § 9, similar. | Art. I, § 8, similar. | Art. I, § 6, similar. |
| Florida.<br>1868.[r]<br>1868.[c] | Art. I, § 9, similar. | Art. I, § 4, similar. | Art. I, § 4, similar. |

| | | | |
|---|---|---|---|
| North Carolina. 1868.r 1868.c | Art. I, § 12, similar. | Art. I, § 13, similar. | Art. I, § 19, may limit the guarantee to "controversies at law respecting property." |
| South Carolina. 1868.r 1868.c | Art. I, § 19, similar. | Art. I, §§ 13, 14, similar. | Art. I, § 11, similar. |
| Louisiana. 1868.r 1868.c | Title I, Art. 6, permits prosecutions to be begun by indictment or information. See Fairman, p. 127. | Title I, Art. 6, similar. In Constitution of 1879 it is provided that where "penalty is not necessarily imprisonment at hard labor or death" the legislature may provide for a jury of less than twelve. Art. 7. | No provision in Bill of Rights. Title IV, Art. 87, indicates that at least up to one hundred dollars no jury trial need be provided. In Constitution of 1879 the legislature is empowered to provide for less than unanimous verdicts. Art. 116. |
| Alabama. 1868.r 1867.c | Art. I, § 10, similar. | Art. I, § 8, similar. | Art. I, § 13, similar. |
| Georgia. 1868.r 1868.c | Silent. | Art. I, § 7, appears to be similar. But Art. V, § 4, cl. 5, states that offenses before a District Judge shall be tried to a jury of seven. Art. V, § 4, cl. 2, defines the jurisdiction of District Courts; they try all crimes not punishable with death or imprisonment in the penitentiary. | Art. V, § 13, appears to be similar. But Art. V, § 3, cl. 3, states that the Superior Court can render judgment without jury "in all civil cases founded on contract, where an issuable defence is not filed on oath." |

146

| STATES | FIFTH AMENDMENT<br>"No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury ...." | SIXTH AMENDMENT<br>"In all criminal prosecutions the accused shall enjoy the right to a speedy and public trial, by an impartial jury ...." | SEVENTH AMENDMENT<br>"In suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved ...." |
|---|---|---|---|
| **States Ratifying After Proclamation of Ratification** | | | |
| Virginia. 1869.[r] 1864.[c] | Silent. | Art. I, § 8, similar. | Art. I, § 11, similar. |
| Mississippi. 1870.[r] 1868.[c] | Art. I, § 31, similar. | Art. I, § 7, similar. | Art. I, § 12, similar. |
| Texas. 1870.[r] 1868.[c] | Art. I, § 8, permits institution of criminal proceedings on indictment or information. | Art. I, §§ 8, 12, similar. | Art. V, § 16, similar. |
| **States Admitted to the Union After the Ratification of the Fourteenth Amendment** | | | |
| Colorado. 1876.[ad] 1876.[c] | Art. II, § 23, provides grand jury shall have only twelve, nine of whom can indict. It also provides that: "The general assembly may change, regulate, or abolish the grand-jury system." | Art. II, §§ 16, 23, similar. | Art. II, § 23, permits legislature to set the size of the jury at less than twelve. |

| State | | | |
|---|---|---|---|
| North Dakota. 1889.[a,d] 1889.[c] | Art. I, § 8, guarantees indictment for felonies, but also states that the legislature may abolish the grand-jury system. | Art. I, § 7, similar. | Art. I, § 7, limits its guarantee to courts of record, but the delineation of jurisdiction is not clear. |
| Montana. 1889.[a,d] 1889.[c] | Art. III, § 8, permits prosecution by information and provides that if a grand jury be established it shall have seven persons, five of whom can indict. | Art. III, §§ 16, 23. The latter section provides that in criminal actions not amounting to a felony a two-thirds vote is sufficient to convict. | Art. III, § 23, provides for a two-thirds verdict. Furthermore the jury in a Justice's court is composed of not more than six persons. Such courts have jurisdiction up to three hundred dollars. Art. VIII, § 20. |
| South Dakota. 1889.[a,d] 1889.[c] | Art. VI, § 10, provides for institution of criminal actions by information or indictment and permits the legislature to abolish the grand jury entirely. | Art. VI, §§ 6, 7, similar. | Art. VI, § 6, permits legislature to provide for three-fourths vote. In courts not of record juries of less than twelve are permitted. |
| Washington. 1889.[d] 1889.[c] | Art. I, § 25, sanctions the use of information to initiate criminal proceedings. | Art. I, § 21, similar. | Art. I, § 21, provides for a three-fourths verdict in courts of record and for juries of less than twelve in courts not of record. |
| Idaho. 1890.[a,d] 1889.[c] | Art. I, § 8, provides for institution of criminal actions by information or indictment. | Art. I, § 7, provides that for misdemeanors a five-sixths verdict can convict. | Art. I, § 7, provides for a three-fourths verdict. |

148

| FIFTH AMENDMENT "No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury . . . ." | SIXTH AMENDMENT "In all criminal prosecutions the accused shall enjoy the right to a speedy and public trial, by an impartial jury . . . ." | SEVENTH AMENDMENT "In suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved . . . ." |
|---|---|---|
| STATES ADMITTED TO THE UNION AFTER THE RATIFICATION OF THE FOURTEENTH AMENDMENT—Continued | | |

**Wyoming. 1890.[ad] 1889.[c]**

| | | |
|---|---|---|
| Art. I, § 13, continues grand jury until otherwise provided. Art. I, § 9, provides that the grand jury will be composed of twelve, nine of whom can indict. The legislature is empowered to change or abolish the grand-jury system. | Art. I, § 9, similar. | Art. I, § 9, permits the legislature to establish juries of less than twelve. |

**Utah. 1896.[ad] 1895.[c]**

| | | |
|---|---|---|
| Art. I, § 13, offers alternatives: the charge may be brought before a committing magistrate and if the accused is held by such magistrate he may be tried on information; the alternative is indictment, but by a grand jury of seven, five to indict. | Art. I, § 10, preserves traditional jury only in capital cases. In other prosecutions, if in courts of general jurisdiction, there shall be a jury of eight; if in courts of inferior jurisdiction, there shall be a jury of four. | Art. I, § 10, provides that in courts of general jurisdiction trial shall be to a jury of eight, verdict by three-fourths vote. In courts of inferior jurisdiction trial is to a jury of four, verdict by three-fourths vote. |

**Oklahoma. 1907.[ad] 1907.[c]**

| | | |
|---|---|---|
| Art. II, § 17, permits prosecution by indictment or information. Art. II, § 18, provides that a grand jury, if any, is to be composed of twelve jurors, nine needed to indict. | Art. II, § 19, requires unanimous verdict in felony cases, but only three-fourths in trial of other crimes. Inferior courts are established with juries of six. | Art. II, § 19, provides for a three-fourths verdict. |

149

| | | | |
|---|---|---|---|
| Arizona. 1912.[ad] 1910.[c] | Art. II, § 30, permits initiation of criminal proceedings by either information or indictment. | Art. II, § 23, permits juries of less than twelve in courts not of record. Art. VI, §§ 6, 10, may indicate legislature can vest such courts with jurisdiction over all misdemeanors. | Art. II, § 23, provides that the legislature may establish a three-fourths verdict in courts of record and juries of less than twelve in courts not of record. |
| New Mexico. 1912.[ad] 1911.[c] | Art. II, § 14, permits initiation of criminal proceedings by either information or indictment. If by indictment, grand jury must have at least twelve jurors; if there are twelve jurors, eight can indict, if more than twelve, a majority can indict. | Art. II, § 12, similar. | Art. II, § 12, permits the legislature to provide for a less-than-unanimous vote. In cases triable by courts lower than the District Courts (Justices of the Peace can be given jurisdiction up to two hundred dollars, Art. VI, § 26), the legislature can establish juries of six. |
| Alaska. 1959.[ad] 1958.[c] | Art. I, § 8, guarantees grand jury, but the grand jury is of twelve, a majority of whom can indict. | Art. I, § 11, permits legislature to provide for juries of between six and twelve in courts not of record, and does not specify jurisdictional limits of such courts. | Art. I, § 16, provides for a jury only if more than two hundred and fifty dollars is involved. Furthermore, the verdict in such cases is to be by three-fourths vote if the legislature so desires. |

Mr. Justice Black, with whom The Chief Justice and Mr. Justice Douglas concur, dissenting.

Petitioner, Bartkus, was indicted in a United States District Court for bank robbery. He was tried by a jury and acquitted. So far as appears the trial was conducted fairly by an able and conscientious judge. Later, Bartkus was indicted in an Illinois state court for the same bank robbery. This time he was convicted and sentenced to life imprisonment. His acquittal in the federal court would have barred a second trial in any court of the United States because of the provision in the Fifth Amendment that no person shall "be subject for the same offence to be twice put in jeopardy of life or limb." The Court today rejects Bartkus' contention that his state conviction after a federal acquittal violates the Fourteenth Amendment to our Constitution. I cannot agree.

The Court's holding further limits our already weakened constitutional guarantees against double prosecutions. *United States* v. *Lanza,* 260 U. S. 377, decided in 1922, allowed federal conviction and punishment of a man who had been previously convicted and punished for the identical acts by one of our States. Today, for the first time in its history, this Court upholds the state conviction of a defendant who had been *acquitted* of the same offense in the federal courts. I would hold that a federal trial following either state acquittal or conviction is barred by the Double Jeopardy Clause of the Fifth Amendment. *Abbate* v. *United States, post,* p. 201 (dissenting opinion). And, quite apart from whether that clause is as fully binding on the States as it is on the Federal Government, see *Adamson* v. *California,* 332 U. S. 46, 68 (dissenting opinion), I would hold that Bartkus' conviction cannot stand. For I think double prosecutions for the same offense are so contrary to the spirit of our free country that they violate even the prevailing view of the

Fourteenth Amendment, expressed in *Palko* v. *Connecticut,* 302 U. S. 319.[1]

The Fourteenth Amendment, this Court said in *Palko,* does not make all of the specific guarantees of the Bill of Rights applicable to the States.   But, the Court noted, some of "the privileges and immunities" of the Bill of Rights, "have been taken over . . . and brought within the Fourteenth Amendment by a process of absorption." 302 U. S., at 326.   The Court indicated that incorporated in due process were those "principle[s] of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental."   302 U. S., at 325.[2]   It then held that a statute allowing a State to appeal in a criminal case did not violate such fundamental principles.   But it expressly left open the question of whether "the state [could be] permitted after a trial free from error to try the accused over again."   302 U. S., at 328.   That question is substantially before us today.

Fear and abhorrence of governmental power to try people twice for the same conduct is one of the oldest ideas found in western civilization.   Its roots run deep into

---

[1] While I participated in the Court's holding and opinion in *Palko* I have since expressed my disagreement with both, as has MR. JUSTICE DOUGLAS.   *Adamson* v. *California,* 332 U. S. 46, 68 (dissenting opinion).   See also *Rochin* v. *California,* 342 U. S. 165, 174, 177 (concurring opinions); *Hoag* v. *New Jersey,* 356 U. S. 464, 477, 480, n. 5 (dissenting opinion).

[2] The Court expressed the same thought in various other ways. The crucial principles were termed those "implicit in the concept of ordered liberty," 302 U. S., at 325; those without which it would be impossible "to maintain a fair and enlightened system of justice," *ibid.;* or without which "neither liberty nor justice would exist," *id.,* at 326; those "fundamental principles of liberty and justice which lie at the base of all our civil and political institutions," and those whose absence creates "a hardship so acute and shocking that our polity will not endure it."   *Id.,* at 328.

Greek and Roman times.[3]   Even in the Dark Ages, when
so many other principles of justice were lost, the idea that
one trial and one punishment were enough remained alive
through the canon law and the teachings of the early
Christian writers.[4]   By the thirteenth century it seems
to have been firmly established in England,[5] where it came

[3] See Bonner, Lawyers and Litigants in Ancient Athens, 195; 1 Pot-
ter, Grecian Antiquities (1808), 194; Radin, Roman Law, 475, n. 28;
2 Sherman, Roman Law in the Modern World (3d ed. 1937), 488–
489; Berner, Non bis in idem, 3 Archiv für Preussisches Strafrecht
(1855), 472; Digest of Justinian: Digest 48.2.7.2, translated in 11
Scott, The Civil Law, 17, as "The governor should not permit the
same person to be again accused of crime of which he has been
acquitted."

[4] The canon law opposition to double trials stemmed from a reading
given by St. Jerome in 391 A. D. to I Nahum 9 (Douay version),
"there shall not rise a double affliction." (In the King James version,
I Nahum 9, is given as "affliction shall not rise up the second time.")
Jerome drew from this the rule that God does not punish twice for
the same act. See 25 Migne, Patrologia Latina (1845), 1238. This
maxim found its way into church canons as early as 847 A. D. and
was subsequently given as, "Not even God judges twice for the same
act." See Brooke, The English Church and the Papacy, 205;
2 Maitland, Collected Papers (Fisher ed. 1911), Essay, Henry II and
the Criminous Clerks, 239; 1 Pollock and Maitland, History of
English Law (2d ed. 1899), 448–449; Poole, Domesday Book to
Magna Carta, 206. See also Berner, op. cit., supra, note 3, emphasiz-
ing the Roman antecedents of the canon law rule.

[5] See 2 Bracton, De Legibus et Consuetudinibus Angliae (Wood-
bine ed. 1922), 391, 397, applying the concept even to acquittals in
trial by battle. Cf. 2 Hawkins, Pleas of the Crown (4th ed. 1762),
368–379; 2 Staundeforde, Les Plees Del Corone (rev. ed. 1583),
105–108.

In the twelfth century avoidance of double punishment was a
major element in the celebrated controversy between St. Thomas
Becket and King Henry II.   Henry wanted clerics who had been
convicted of crimes in church courts turned over to lay tribunals
for their punishment.   Whether Becket was in fact correct in his
assertions that Henry's proposals would result in double punishment
for the clerics has been much debated by historians.   In all events,

to be considered as a "universal maxim of the common law." [6] It is not surprising, therefore, that the principle was brought to this country by the earliest settlers as part of their heritage of freedom,[7] and that it has been

Henry's plan was abandoned after Becket's murder. See Brooke, *op. cit., supra,* note 4, at 190–214; 2 Maitland, *op. cit., supra,* note 4; 1 Pollock and Maitland, *op. cit., supra,* note 4, at 447–456; Poole, *op. cit., supra,* note 4, at 203–218.

[6] 2 Cooley's Blackstone (4th ed. 1899), *335, 336. See also 2 Staundeforde, *op. cit., supra,* note 5, at 105–108; Lambert, Crompton and Dalton, Manuall or Analecta (rev. ed. 1642), 69–70; 3 Coke, Institutes (6th ed. 1680), 213–214; 2 Hawkins, *op. cit., supra,* note 5, at 368–379. One commentator has stated that the concept was borrowed by English law from the canon law doctrine of criminal procedure. Radin, Anglo-American Legal History, 228.

In 1487 an exception was made in the rule by a statute dealing with the "Authority of the Court of Star Chamber," 3 Hen. 7, c. 1. At the time criminal proceedings could be brought in two ways, by government indictment and by the parties who suffered injury from the crime. 3 Hen. 7, c. 1, provided that in "Death or Murder" cases a defendant acquitted or attainted under government prosecution could be tried again on charges brought by "the Wife, or next Heir to him so slain." The Act was apparently never broadened and was given an extremely narrow construction. See Hawkins, *op. cit., supra,* note 5, at 373–374, 377–379. See also Staundeforde, *op. cit., supra,* note 5, at 106–108. It soon fell into disuse, and the legal profession was greatly shocked when, in 1818, the statute was relied on to justify the retrial of a defendant who had previously been acquitted. After many maneuvers, which included upholding the defendant's right to trial by battle, a second acquittal was obtained, and the loophole in the "universal rule" against double trials was formally plugged by Parliament. See Radin, Anglo-American Legal History, 226–227, n. 24; Kirk, "Jeopardy" During the Period of the Year Books, 32 U. Pa. L. Rev. 602, 608–609.

[7] The Body of Liberties of Massachusetts (1641), clause 42, reads, "No man shall be twise sentenced by Civill Justice for one and the same Crime, offence, or Trespasse." See also The Laws and Liberties of Massachusetts (1648) (Farrand ed. 1929) 47, "everie Action . . . in *criminal* Causes shall be . . . entred in the *rolls* of everie Court . . . that such Actions be not afterwards brought again to

recognized here as fundamental again and again.[8]   Today it is found, in varying forms, not only in the Federal Constitution, but in the jurisprudence or constitutions of every State, as well as most foreign nations.[9]   It has, in fact, been described as a part of all advanced systems of law[10] and as one of those universal principles "of reason, justice, and conscience, of which Cicero said: 'Nor is it one thing at Rome and another at Athens, one now and another in the future, but among all nations it is the same.' "[11]   While some writers have explained the opposition to double prosecutions by emphasizing the injustice inherent in two punishments for the same act,[12] and others have stressed the dangers to the innocent from allowing the full power of the state to be brought against them

the vexation of any man."   Similarly the pleas of former conviction and acquittal were recognized in colonial Virginia.   Scott, Criminal Law in Colonial Virginia, 81–82, 102.

[8] See, e. g., Ex parte Lange, 18 Wall. 163; Green v. United States, 355 U. S. 184, 198 (majority and dissenting opinions); Commonwealth v. Olds, 5 Litt. Rep. (Ky.) 137 (1824); State v. Cooper, 13 N. J. L. 361, 370 (1833).

[9] All but five States recognize the principle in their constitutions. Each of these five prohibits double jeopardy as part of its common law.   See Brock v. North Carolina, 344 U. S. 424, 429, 435 (dissenting opinion); American Law Institute, Double Jeopardy (1935), 61–72.

The maxim "non bis in idem" is found throughout the civil law. See Batchelder, Former Jeopardy, 17 Am. L. Rev. 735.   See also Berner, Non bis in idem, 3 Archiv für Preussisches Strafrecht (1855), 472; Küssner, Non bis in idem, id., at 198; Donnedieu de Vabres, Droit Criminel (3d ed. 1947), 886–887; It. Codice di Procedura Penale, Art. 90, 579 (Ludus ed. 1955).   But cf. Radin, Anglo-American Legal History, 228.

[10] American Law Institute, Double Jeopardy (1935), Introductory note, p. 7.

[11] Batchelder, Former Jeopardy, 17 Am. L. Rev. 735.

[12] See, e. g., Ex parte Lange, 18 Wall. 163, 168–169.

in two trials,[13] the basic and recurring theme has always simply been that it is wrong for a man to "be brought into Danger for the same Offence more than once." [14] Few principles have been more deeply "rooted in the traditions and conscience of our people."

The Court apparently takes the position that a second trial for the same act is somehow less offensive if one of the trials is conducted by the Federal Government and the other by a State. Looked at from the standpoint of the individual who is being prosecuted, this notion is too subtle for me to grasp. If double punishment is what is feared, it hurts no less for two "Sovereigns" to inflict it than for one. If danger to the innocent is emphasized, that danger is surely no less when the power of State and Federal Governments is brought to bear on one man in two trials, than when one of these "Sovereigns" proceeds alone. In each case, inescapably, a man is forced to face danger twice for the same conduct.

The Court, without denying the almost universal abhorrence of such double prosecutions, nevertheless justifies the practice here in the name of "federalism." This, it seems to me, is a misuse and desecration of the concept. Our Federal Union was conceived and created "to establish Justice" and to "secure the Blessings of Liberty," not to destroy any of the bulwarks on which both freedom and justice depend. We should, therefore, be suspicious of any supposed "requirements" of "federalism" which result in obliterating ancient safeguards. I have been shown nothing in the history of our Union, in the writings of its Founders, or elsewhere, to indicate that individual rights deemed essential by both State and Nation were to

---

[13] See, e. g., Commonwealth v. Olds, 5 Litt. Rep. (Ky.) 137, 139 (1824) ; State v. Cooper, 13 N. J. L. 361, 370–371 (1833) ; 2 Tucker, Constitution of the United States, 675.

[14] 2 Hawkins, op. cit., supra, note 5, at 372. See also id., at 377.

be lost through the combined operatio〉s of the two governments.　Nor has the Court given any sound reason for thinking that the successful operation of our dual system of government depends in the slightest on the power to try people twice for the same act.

Implicit in the Court's reliance on "federalism" is the premise that failure to allow double prosecutions would seriously impair law enforcement in both State and Nation.　For one jurisdiction might provide minor penalties for acts severely punished by the other and by accepting pleas of guilty shield wrongdoers from justice.　I believe this argument fails on several grounds.　In the first place it relies on the unwarranted assumption that State and Nation will seek to subvert each other's laws.　It has elsewhere been persuasively argued that most civilized nations do not and have not needed the power to try people a second time to protect themselves even when dealing with foreign lands.[15]　It is inconceivable to me, as it was to the Constitutional Court of South Carolina in 1816, that "If this prevails among nations who are strangers

---

[15] Grant, The *Lanza* Rule of Successive Prosecutions, 32 Col. L. Rev. 1309; Grant, Successive Prosecutions by State and Nation, 4 U. C. L. A. L. Rev. 1; Developments in the Law—Conspiracy, 72 Harv. L. Rev. 920, 968, n. 347.　Cf. *Feldman* v. *United States,* 322 U. S. 487, 494 (dissenting opinion); *Knapp* v. *Schweitzer,* 357 U. S. 371, 382 (dissenting opinion).. In England the doctrine that a foreign acquittal is a good plea in bar seems to antedate the American Revolution.　See *Rex* v. *Hutchinson,* as reported in *Beak* v. *Thyrwhit,* 3 Mod. 194, 87 Eng. Rep. 124 (1689), and *Burrows* v. *Jemino,* 2 Str. 733, 93 Eng. Rep. 815 (1726), but compare the report of the same case in *Gage* v. *Bulkeley,* Ridg. T. H. 263, 27 Eng. Rep. 824 (1744); *Rex* v. *Roche,* 1 Leach 134, 135n, 168 Eng. Rep. 169, 169n (1775).　Cf. *Rex* v. *Thomas,* 1 Sid. 179, 82 Eng. Rep. 1043; 1 Lev. 118, 83 Eng. Rep. 326; 1 Keb. 663, 83 Eng. Rep. 1172 (1664); 2 Hawkins, *op. cit., supra,* note 5, at 372.　See also *Rex* v. *Aughet,* 26 Cox C. C. 232, 238 (C. C. A. 1918); 10 Halsbury, The Laws of England (3d ed. 1955), 405.

to each other, [it could] fail to [prevail] with us who are so intimately bound by political ties." *State* v. *Antonio,* 2 Treadway's Const. Rep. (S. C.) 776, 781. Cf. *Testa* v. *Katt,* 330 U. S. 386.

The Court's argument also ignores the fact that our Constitution allocates power between local and federal governments in such a way that the basic rights of each can be protected without double trials. The Federal Government is given power to act in limited areas only, but in matters properly within its scope it is supreme. It can retain exclusive control of such matters, or grant the States concurrent power on its own terms. If the States were to subvert federal laws in these areas by imposing inadequate penalties, Congress would have full power to protect the national interest, either by defining the crime to be punished and establishing minimum penalties applicable in both state and federal courts, or by excluding the States altogether. Conversely, in purely local matters the power of the States is supreme and exclusive. State courts can and should, therefore, protect all essentially local interests in one trial without federal interference. Cf. *Rutkin* v. *United States,* 343 U. S. 130, 139 (dissenting opinion). In areas, however, where the Constitution has vested power in the Federal Government the States necessarily act only to the extent Congress permits, and it is no infringement on their basic rights if Congress chooses to fix penalties smaller than some of them might wish. In fact, this will rarely occur, for Congress is not likely to use indirect means to limit state power when it could accomplish the same result directly by pre-empting the field.[16]

---

[16] See, *e. g., Hines* v. *Davidowitz,* 312 U. S. 52. Cf. *Weber* v. *Anheuser-Busch, Inc.,* 348 U. S. 468. Significantly, *United States* v. *Lanza,* 260 U. S. 377, involved the only situation where the Court's argument may have had some slight validity. For that case was

Ultimately the Court's reliance on federalism amounts to no more than the notion that, somehow, one act becomes two because two jurisdictions are involved. Hawkins, in his Pleas of the Crown, long ago disposed of a similar contention made to justify two trials for the same offense by different counties as "a mere Fiction or Construction of Law, which shall hardly take Place against a Maxim made in Favour of Life."[17] It was discarded as a dangerous fiction then, it should be discarded as a dangerous fiction now.

To bolster its argument that successive state and federal prosecutions do not violate basic principles of justice, the Court cites many cases. It begins with eight early state decisions which, it says, "clarified the issue by stating opposing arguments." Four of these cases held that prosecution by one government must bar subsequent prosecutions elsewhere.[18] Two of the remaining four refused to hold that concurrent jurisdiction could exist since they feared that such a holding might bring about two trials for the same offense, a result they considered too shocking to tolerate. "This is against natural justice," said the North Carolina Superior Court in 1794, "and therefore I cannot believe it to be law."[19] The seventh case cited is an inconclusive discussion coming from a State whose highest court had previously stated

concerned with a prohibition violation, and the Eighteenth (Prohibition) Amendment could be taken to have established an area of concurrent state and national power where the Federal Government was not supreme. See *Pennsylvania* v. *Nelson*, 350 U. S. 497, 500.

[17] 2 Hawkins, *op. cit., supra,* note 5, at 370. See also 2 Staundeforde, *op. cit., supra,* note 5, at 105–106.

[18] *State* v. *Antonio,* 2 Treadway's Const. Rep. (S. C.) 776 (1816); *State* v. *Randall,* 2 Aikens (Vt.) 89 (1827); *Harlan* v. *People,* 1 Doug. Rep. (Mich.) 207 (1843); *Commonwealth* v. *Fuller,* 8 Met. (Mass.) 313 (1844).

[19] *State* v. *Brown,* 2 N. C. *100, 101 (1794). See also *Mattison* v. *State,* 3 Mo. *421 (1834).

unequivocally that a bar against double prosecutions would exist.[20] Thus only one of these early state cases actually approves the doctrine the Court today advances, and that approval is in dicta.[21] Significantly, the highest court of the same State later expressed the view that such double trials would virtually never occur in our country.[22]

The Court relies mainly, however, on a later line of decisions starting with *Fox* v. *Ohio,* 5 How. 410. Most of these, like *Fox* itself, involved only the question of whether both State and Federal Governments could make the same conduct a crime. Although some, in dicta, admitted the possibility that double prosecutions might result from such concurrent power, others did not discuss the question.[23] Many, especially among the earlier cases, pointed out that double punishment violates the genius of our

---

[20] *State* v. *Tutt,* 2 Bailey (S. C.) 44 (1830). Compare *State* v. *Antonio,* 2 Treadway's Const. Rep. (S. C.) 776 (1816).

[21] *Hendrick* v. *Commonwealth,* 5 Leigh (Va.) 707 (1834).

[22] *Jett* v. *Commonwealth,* 18 Gratt. (59 Va.) 933, 947, 959 (1867).

[23] See, *e. g., State* v. *Duncan,* 221 Ark. 681, 255 S. W. 2d 430; *Dashing* v. *State,* 78 Ind. 357; *State* v. *Gauthier,* 121 Me. 522, 118 A. 380; *Commonwealth* v. *Nickerson,* 236 Mass. 281, 128 N. E. 273; *State* v. *Holm,* 139 Minn. 267, 166 N. W. 181; *State* v. *Whittemore,* 50 N. H. 245; *State* v. *Frach,* 162 Ore. 602, 94 P. 2d 143; *Commonwealth ex rel. O'Brien* v. *Burke,* 171 Pa. Super. 273, 90 A. 2d 246; *Jett* v. *Commonwealth,* 18 Gratt. (59 Va.) 933. See also *State* v. *Tutt,* 2 Bailey (S. C.) 44; *State* v. *Brown,* 2 N. C. *100. Dicta can, of course, be found which runs against the Court's holding. See, *e. g., Nielsen* v. *Oregon,* 212 U. S. 315, 320, where this Court said: "Where an act is . . . prohibited and punishable by the laws of both States, the one first acquiring jurisdiction of the person may prosecute the offense, and its judgment is a finality in both States, so that one convicted or acquitted in the courts of the one State cannot be prosecuted for the same offense in the courts of the other." And *United States* v. *Furlong,* 5 Wheat. 184, 197, "Robbery on the seas is . . . within the criminal jurisdiction of all nations . . . and there can be no doubt that the plea of *autre fois acquit* would be good in any civilized State, though resting on a prosecution instituted in the Courts of any other civilized State."

free country and therefore would never occur. As Chief Justice Taney, on circuit, said in one of them "Yet in all civilized countries it is recognized as a fundamental principle of justice that a man ought not to be punished twice for the same offence; and if this party had been punished . . . in the state tribunal, the court would have felt it to be its duty to suspend sentence, and to represent the facts to the president, to give him an opportunity of . . . granting a pardon." [24] While a limited number of cases after *Fox* are cited in which a double conviction was upheld, in several of these the second court was so troubled by the result that only nominal sentences were imposed.[25] In fact, before *United States* v. *Lanza,* 260 U. S. 377 (1922), where this Court upheld and encouraged the practice, the cases of actual double punishment found are so few, in relation to the great mass of criminal cases decided, that one can readily discern an instinctive unwillingness to impose such hardships on defendants.[26]

Despite its exhaustive research, the Court has cited only three cases before *Lanza* where a new trial after an *acquittal* was upheld. In one of these, *United States* v. *Barnhart,* 22 F. 285, the state court in which the defendant had been acquitted did not have jurisdiction of the action. The Federal Circuit Court relied on this lack of jurisdiction in allowing a retrial, but made

[24] *United States* v. *Amy,* 24 Fed. Cas. No. 14,445, at 811. See also *Fox* v. *Ohio,* 5 How. 410, 435; *United States* v. *Wells,* 28 Fed. Cas. 522, No. 16,665; *Jett* v. *Commonwealth,* 18 Gratt. (59 Va.) 933, 947.

[25] See, *e. g., United States* v. *Palan,* 167 F. 991, 992–993, "to punish a man twice for the same offence shocks the sense of justice." See also *United States* v. *Holt,* 270 F. 639, 642–643.

[26] The Court also relies on cases arising since *Lanza* where fear of that holding caused tight construction of federal laws to avoid double prosecutions. See *Jerome* v. *United States,* 318 U. S. 101; *Screws* v. *United States,* 325 U. S. 91. Cf. *Pennsylvania* v. *Nelson,* 350 U. S. 497, 509. These cases can hardly be thought to approve the result they sought to avoid.

an alternate holding based on the same general arguments used by the Court today.[27] The *Barnhart* opinion also intimated that the first trial may have been a sham.[28] Sham trials, as well as those by courts without jurisdiction, have been considered by courts and commentators not to be jeopardy, and might therefore not bar subsequent convictions.[29] In the second case cited by the Court, the state conviction followed acquittal by a federal court-martial at a time when, as the state court seemed to recognize, a military trial was thought by many not to be a trial for the purpose of double jeopardy even when both trials were conducted by the same "Sovereign." [30] The third case relied on, a 1915 decision from the State of Washington, is the only one of the three where it can fairly be said that a defendant acquitted in a proper

---

[27] The case involved the killing of an Indian by white men on an Indian reservation. The court said: "The defendants have never been tried for the offense charged in this indictment. For either, the state court before which they were tried had no jurisdiction in the premises, and then the proceeding set forth in the pleas was a nullity; or if it had, it was an offense against the law of the state and not the United States." 22 F., at 291. The court was correct in its belief that the state court had no jurisdiction. See *Williams* v. *Lee*, 358 U. S. 217. The decision was on a demurrer to a plea of former acquittal and it does not appear whether the federal jury convicted.

[28] The court noted, "No white man was ever hung for killing an Indian, and no Indian tried for killing a white man ever escaped the gallows." 22 F., at 289.

[29] See, *e. g.*, *United States* v. *Ball*, 163 U. S. 662, 669; *Edwards* v. *Commonwealth*, 233 Ky. 356, 25 S. W. 2d 746. Cf. *United States* v. *Mason*, 213 U. S. 115, 120, 125. See also 2 Hawkins, *op. cit., supra*, note 5, at 370.

[30] *State* v. *Rankin*, 4 Cold. (Tenn.) 145, 157 (1867). The *Rankin* court cited an account of a federal court-martial following acquittal by Florida territorial courts. Similarly, *United States* v. *Cashiel*, 25 Fed. Cas. 318, No. 14,744 (1863), upheld a federal prosecution following prosecution by the United States military authorities.

jury trial was subsequently tried again by a jury and convicted.[31]

One may, I think, infer from the fewness of the cases that retrials after acquittal have been considered particularly obnoxious, worse even, in the eyes of many, than retrials after conviction.[32] I doubt, in fact, if many practices which have been found to violate due process can boast of so little actual support. Yet it is on this meager basis that the Court must ultimately rest its finding that Bartkus' retrial does not violate fundamental principles "rooted in the traditions and conscience of our peoples." Nor are these scattered and dubious cases unchallenged, for, balanced against them, we have a firm holding by this Court sustaining an extremely narrow construction of a federal statute in order to make a state acquittal conclusive in the federal courts and thereby avoid the evil approved today. *United States* v. *Mason*, 213 U. S. 115. That case, as well as the "sacred duty . . . to maintain unimpaired those securities for the personal rights of the individual which have received for ages the sanction of the jurist and the statesman," *Ex parte Lange*, 18 Wall. 163, 178, should make us doubly hesitant to encourage so blatant a violation of constitutional policies against double trials by giving an "illiberal construction . . . to the words of the fundamental law in which they are embodied." *Ibid.*

Since *Lanza* people have apparently become more accustomed to double trials, once deemed so shocking, just

---

[31] *State* v. *Kenney*, 83 Wash. 441, 145 P. 450.

[32] See, *e. g., Commonwealth* v. *Olds*, 5 Litt. Rep. (Ky.) 137, 139; *State* v. *Cooper*, 13 N. J. L. 361, 370–371. See also Iowa Const., Art. I, § 12; Mich. Const., Art. II, § 14; Mo. Const., Art. I, § 19; N. H. Const., Pt. First Art. 16; N. J. Const., Art. I, ¶ 11; R. I. Const., Art. I, § 7; Tex. Const., Art. I, § 14. The Federal Bill of Rights did not, of course, differentiate between retrials after acquittal and retrials after conviction; it banned both.

as they might, in time, adjust themselves to all other violations of the Bill of Rights should they be sanctioned by this Court. The Court is therefore able to find a 1943 state case, as well as four federal cases in the last five years, in which a conviction following acquittal was sustained.[33] Thus this practice, which for some 150 years was considered so undesirable that the Court must strain to find examples, is now likely to become a commonplace. For, after today, who will be able to blame a conscientious prosecutor for failing to accept a jury verdict of acquittal when he believes a defendant guilty and knows that a second try is available in another jurisdiction and that such a second try is approved by the Highest Court in the Land? Inevitably, the victims of such double prosecutions will most often be the poor and the weak in our society, individuals without friends in high places who can influence prosecutors not to try them again. The power to try a second time will be used, as have all similar procedures, to make scapegoats of helpless, political, religious, or racial minorities and those who differ, who do not conform and who resist tyranny. See *Chambers v. Florida,* 309 U. S. 227, 236.

There are some countries that allow the dangerous practice of trying people twice. I am inserting below a recent news item about a man who was tried, convicted, sentenced to prison and then was tried again, convicted and sentenced to death.[34] Similar examples are not hard

---

[33] *New Jersey* v. *Cioffe,* 130 N. J. L. 160, 32 A. 2d 79 (1943); *Serio* v. *United States,* 203 F. 2d 576 (1953); *Jolley* v. *United States,* 232 F. 2d 83 (1956); *Smith* v. *United States,* 243 F. 2d 877 (1957); *Rios* v. *United States,* 256 F. 2d 173 (1958).

[34] The New York Times for October 22, 1958, p. 4, col. 6, carried the following item under the Moscow date line:

"A 19-year-old 'stilyag' (zoot-suiter) was re-tried and sentenced to death following public protests that the original ten to twenty-five-

to find in lands torn by revolution or crushed by dictator-
ship. I had thought that our constitutional protections
embodied in the Double Jeopardy and Due Process
Clauses would have barred any such things happening
here. Unfortunately, last year's holdings by this Court
in *Ciucci* v. *Illinois*, 356 U. S. 571, and *Hoag* v. *New Jer-
sey*, 356 U. S. 464, and today's affirmance of the convic-
tions of Bartkus and Abbate cause me to fear that in an
important number of cases it can happen here.

I would reverse.

MR. JUSTICE BRENNAN, whom THE CHIEF JUSTICE and
MR. JUSTICE DOUGLAS join, dissenting.

Bartkus was tried and acquitted in a Federal District
Court of robbing a federally insured savings and loan asso-
ciation in Cicero, Illinois. He was indicted for the same
robbery by the State of Illinois less than three weeks later,
and subsequently convicted and sentenced to life impris-
onment. The single issue in dispute at both trials was
whether Bartkus was the third participant in the robbery
along with two self-confessed perpetrators of the crime.

The Government's case against Bartkus on the federal
trial rested primarily upon the testimony of two of the
robbers, Joseph Cosentino and James Brindis, who con-

---

year term imposed for killing a militiaman during a robbery was too
lenient, the newspaper Komsomolskaya Pravda said today.

"The condemned youth was Victor Shanshkin, leader of a gang of
four youths who tried to break into a Moscow store last May, accord-
ing to the newspaper of the Young Communist Organization.

"He pumped seven bullets into the militiaman, who tried to pre-
vent the robbery.

"The four escaped, but were later arrested and sentenced to prison
terms ranging from ten to twenty-five years. The sentences aroused
widespread public protests.

"At the second trial, held recently, Shanshkin was sentenced to die.
The other three, all under 20 years of age, were ordered to serve
prison terms ranging from ten to twenty years."

fessed their part in the crime and testified that Bartkus was their confederate. The defense was that Bartkus was getting a haircut in a barber shop several miles away at the time the robbery was committed. The owner of the barber shop, his son and other witnesses placed Bartkus in the shop at the time. The federal jury in acquitting Bartkus apparently believed the alibi witnesses and not Cosentino and Brindis.

The federal authorities were highly displeased with the jury's resolution of the conflicting testimony, and the trial judge sharply upbraided the jury for its verdict. See some of his remarks printed in *United States* v. *Vasen*, 222 F. 2d 3, 9–10 (dissenting opinion). The federal authorities obviously decided immediately after the trial to make a second try at convicting Bartkus, and since the federal courthouse was barred to them by the Fifth Amendment, they turned to a state prosecution for that purpose. It is clear that federal officers solicited the state indictment, arranged to assure the attendance of key witnesses, unearthed additional evidence to discredit Bartkus and one of his alibi witnesses, and in general prepared and guided the state prosecution. Thus the State's Attorney stated at the state trial: "I am particularly glad to see a case where the federal authorities came to see the state's attorney." And Illinois conceded with commendable candor on the oral argument in this Court "that the federal officers did instigate and guide this state prosecution" and "actually prepared this case." Indeed, the State argued the case on the basis that the record showed as a matter of "fair inference" that the case was one in which "federal officers bring to the attention of the state prosecuting authority the commission of an act and furnish and provide him with evidence of defendant's guilt."

I think that the record before us shows that the extent of participation of the federal authorities here constituted this state prosecution actually a second federal

prosecution of Bartkus. The federal jury acquitted Bart-
kus late in December 1953. Early in January 1954 the
Assistant United States Attorney who prosecuted the fed-
eral case summoned Cosentino to his office. Present also
were the FBI agent who had investigated the robbery and
the Assistant State's Attorney for Cook County who later
prosecuted the state case. The Assistant State's Attorney
said to Cosentino, "Look, we are going to get an indict-
ment in the state court against Bartkus, will you testify
against him?" Cosentino agreed that he would. Later
Brindis also agreed to testify. Although they pleaded
guilty to the federal robbery charge in August 1953, the
Federal District Court postponed their sentencing until
after they testified against Bartkus at the state trial,
which was not held until April 1954. The record does not
disclose what sentences were imposed after they testified
at the state trial or whether sentences have yet been
imposed. Both Cosentino and Brindis were also released
on bail pending the state trial, Brindis on his own
recognizance.

In January, also, an FBI agent who had been active
in the federal prosecution purposefully set about strength-
ening the proofs which had not sufficed to convict Bartkus
on the federal trial. And he frankly admitted that
he "was securing it [information] for the federal gov-
ernment," although what he gathered had "gone to the
state authorities." These January efforts of the agent
were singularly successful and may well have tipped the
scales in favor of conviction. He uncovered a new witness
against Bartkus, one Grant Pursel, who had been enlarged
on bail pending his sentencing on his plea of guilty to an
indictment for violation of the Mann Act. Pursel testi-
fied that "about two weeks after the federal trial, in the
first part of January," the FBI agent sought him out to
discuss an alleged conversation between Pursel and Bart-

kus during September 1953 when both were in jail await-
ing their respective federal trials. Pursel's testimony at
the state trial, that Bartkus had told him he participated
in the robbery, was obviously very damaging. Yet, indic-
ative of the attitude of the federal officials that this was
actually a federal prosecution, the FBI agent arranged no
interview between Pursel and any state authority. The
first time that Pursel had any contact whatsoever with
a state official connected with the case was the morning
that he testified. And as in the case of Cosentino and
Brindis, Pursel's sentencing was postponed until after
he testified against Bartkus at the state trial. Here too
the record does not disclose what sentence was imposed
or whether any has yet been imposed.

Also within a month after the federal acquittal the
FBI agent sought out the operator of the barber shop
who had placed Bartkus in his shop at the time of
the robbery. The barber testified at both federal and
state trials that Bartkus entered his shop before 4 o'clock,
about which time the robbery was committed. The agent
testified as a rebuttal witness for the State that the barber
had told him in January that it might have been after
4:30 o'clock when Bartkus entered the shop. And the
significance of the federal participation in this prosecu-
tion is further evidenced by the Assistant State's Attor-
ney's motion at the beginning of the trial, which was
granted over defense objection, to permit the FBI agent
to remain in the courtroom throughout the trial although
other witnesses were excluded.

The Court, although not finding such to be the case
here, apparently acknowledges that under certain circum-
stances it would be necessary to set aside a state convic-
tion brought about by federal authorities to avoid the
prohibition of the Fifth Amendment against a second
federal prosecution. Our task is to determine how much

the federal authorities must participate in a state prosecution before it so infects the conviction that we must set it aside. The test, I submit, must be fashioned to secure the fundamental protection of the Fifth Amendment "that the . . . [Federal Government] with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity . . . ." *Green* v. *United States,* 355 U. S. 184, 187. Under any test based upon these principles, this conviction cannot stand. In allowing the use of federal resources to bring about this second try at Bartkus, the Court denies Bartkus the protection which the Fifth Amendment assures him. Given the fact that there must always be state officials involved in a state prosecution, I cannot see how there can be more complete federal participation in a state prosecution than there was in this case. I see no escape from the conclusion that this particular state trial was in actuality a second federal prosecution—a second federal try at Bartkus in the guise of a state prosecution. If this state conviction is not overturned, then, as a practical matter, there will be no restraints on the use of state machinery by federal officers to bring what is in effect a second federal prosecution.

To set aside this state conviction because infected with constitutional violations by federal officers implies no condemnation of the state processes as such. The conviction is set aside not because of any infirmities resulting from fault of the State but because it is the product of unconstitutional federal action. I cannot grasp the merit of an argument that protection against federal oppression in the circumstances shown by this record would do violence to the principles of federalism. Of course, coopera-

tion between federal and state authorities in criminal law enforcement is to be desired and encouraged, for cooperative federalism in this field can indeed profit the Nation and the States in improving methods for carrying out the endless fight against crime. But the normal and healthy situation consists of state and federal officers cooperating to apprehend lawbreakers and present the strongest case against them at a single trial, be it state or federal. Cooperation in order to permit the Federal Government to harass the accused so as to deny him his protection under the Fifth Amendment is not to be tolerated as a legitimate requirement of federalism. The lesson of the history which wrought the Fifth Amendment's protection has taught us little if that shield may be shattered by reliance upon the requirements of federalism and state sovereignty to sustain this transparent attempt of the Federal Government to have two tries at convicting Bartkus for the same alleged crime. What happened here was simply that the federal effort which failed in the federal courthouse was renewed a second time in the state courthouse across the street. Not content with the federal jury's resolution of conflicting testimony in Bartkus' favor, the federal officers engineered this second prosecution and on the second try obtained the desired conviction. It is exactly this kind of successive prosecution by federal officers that the Fifth Amendment was intended to prohibit. This Court has declared principles in clearly analogous situations which I think should control here. In *Rea* v. *United States*, 350 U. S. 214, the Court held that an injunction should issue against a federal agent's transference of illegally obtained evidence to state authorities for use as the basis of a state charge. If the federal courts have power to defeat a state prosecution by force of their supervision of federal officers, surely the federal courts have power to defeat a state

prosecution transparently employed by federal authorities in violation of the Fifth Amendment. In *Knapp* v. *Schweitzer*, 357 U. S. 371, 380, we declared: "Of course the Federal Government may not take advantage of . . . the States' autonomy in order to evade the Bill of Rights." See also *Feldman* v. *United States*, 322 U. S. 487, 494; cf. *Byars* v. *United States*, 273 U. S. 28. These principles require, I think, that we set aside this state conviction.