Commonwealth *v.* Vivian, Appellant.

Argued June 21, 1966. Before ERVIN, P. J., WRIGHT, WATKINS, MONTGOMERY, JACOBS, and SPAULDING, JJ. (HOFFMAN, J., absent).

*Howard Gittis,* with him *Judah I. Labovitz,* and *Wolf, Block, Schorr and Solis-Cohen,* and *Defender Association of Philadelphia,* for appellant.

*Gordon Gelfond,* Assistant District Attorney, with him *Benjamin H. Levintow* and *Joseph M. Smith,* Assistant District Attorneys, and *Arlen Specter,* District Attorney, for Commonwealth, appellee.

OPINION BY JACOBS, J., September 15, 1966:

Howard Vivian appeals from the judgment of sentence imposed on five bills of indictment, one of which (Bill 667) charged assault and battery, aggravated assault and battery, and assault and battery with intent to murder, and the other four of which (Bills 712, 751, 752 and 754) charged assault and battery. Five youths

were the victims, all on different dates. The twenty-two year old Vivian plead nolo contendere to the four assault and battery bills and was found guilty by the Hon. EDMUND B. SPAETH, JR., sitting without a jury, on the fifth bill, which involved six year old Joseph Carfagno, who was beaten on the head with a stick and pulled by means of a belt around his neck in a wooded area near his home in northeast Philadelphia. The lower court sustained demurrers to nine other bills, charging corrupting the morals of a minor and solicitation to commit sodomy.

Appellant raises four constitutional arguments, the first three of which apply only to Bill 667, the Carfagno beating. We reject all four arguments and affirm the lower court.

## I.

Appellant argues that his confession should not have been admitted into evidence because he "was interrogated in total disregard of his constitutional right to counsel and without being warned of his right to remain silent." A rather detailed statement of the facts is necessary to adequately understand the circumstances surrounding the confession.

The beating occurred in the early afternoon on Monday, May 10, 1965. The victim, six year old Joseph Carfagno, was admitted to the hospital, where, on Wednesday morning, May 12th, he identified a picture of appellant as his assailant. After this identification, at about 10:30 a.m., Detective Mullin, with other detectives, went to appellant's home and told his mother that the police were investigating the Carfagno beating and that they wished to speak to her son. Appellant was not home so Mullin requested Mrs. Vivian to call them when he came home. After the detectives left, Mrs. Vivian telephoned the family attorney and told

him that the police were looking for her son in connection with the Carfagno beating. The attorney told her "not to worry about it . . . it was just a routine investigation."

In the meantime Mullin and his fellow officers found appellant at the Torresdale Country Club waiting for a caddying job. They told him what they were investigating and asked him to accompany them. He did, stating that he knew nothing of the beating. The police took him to the Nazareth Hospital, where the Carfagno boy was hospitalized, and there they allowed appellant to make a telephone call pursuant to his request to call his lawyer or his mother. It was about 11:30 a.m. at this time. Mrs. Vivian, to whom her son had placed this call, talked to him and then told one of the policemen (who said that he was Mullin but was not) that she was going to call her lawyer "and would they wait there until I called back, which would be about five or ten minutes." Mrs. Vivian again called her attorney who advised her that the police had a right to take her son to the hospital and that they "would either have to book him or let him go." He also again advised her, "Don't worry about it." Mrs. Vivian tried to call the police back at the hospital and after about a half hour reached another policeman at the hospital who informed her that Mullin was upstairs. Mullin was conducting a lineup in the Carfagno boy's hospital room.

After the lineup, at which appellant was identified, Mullin took him to police headquarters. At about 12:45 p.m. Mrs. Vivian telephoned Mullin who asked her if she had the clothes worn by appellant on Monday. She said that she did and would turn them over to him. After getting a search and seizure warrant, three police officers went to the Vivian home and brought the clothes and Mrs. Vivian back to police headquarters, arriving there about 3 p.m.

Mrs. Vivian waited in an outer office for a few minutes while Mullin spoke to appellant alone. Mullin then came out to Mrs. Vivian who was "very nervous". She told him that her son "was down here before and he had gone through this" and that she knew "all about the police and that she wasn't going to let him sign anything and that she was going to get him a lawyer." Told by Mullin that "she had all the right in the world to have a lawyer for her son", Mrs. Vivian went into the interrogation room and in Mullin's presence cautioned her son several times not to give any written statements. She and her son were alone in the room for about a half hour while Mullin got a warrant to arrest appellant for beating the Carfagno boy. Up to the time of this conference between mother and son, no incriminating statements had been made.

Shortly after 4 p.m. Detective Walter Fleming arrived at the police station, whereupon Mrs. Vivian recognized him and introduced herself to him, naming a mutual friend who had introduced her to him. Mrs. Vivian told Fleming why she was there and that her son said he knew nothing about the beating. Fleming, who was not assigned to this case, told her that Mullin had said that there was sufficient evidence to indicate that appellant was guilty. Fleming testified that Mrs. Vivian agreed that he should speak to her son and try to learn exactly what happened. Fleming identified himself to the appellant and told him that his mother had asked Fleming to speak to him. During the discussion appellant first denied committing the beating. When Fleming informed him that there was evidence to the contrary and told him that "if he was guilty, and only he knew, that he should tell the police because it would be on his conscience and he would have to live with this thing", appellant hit the table and said, "All right. I did it." Fleming then asked him what he had done and appellant replied: "Well, I was

walking along the road. I saw this boy. He said something to me. I walked over and I hit him." In response to Fleming's questions, appellant remembered hitting the boy with his fist but couldn't remember anything more. Fleming then brought Mrs. Vivian into the room and asked appellant to tell his mother what he had told him. Whereupon appellant said to his mother, "I did it, Mom; I did it," and broke down. Mullin was then called into the room and Fleming left.

By now, it was about 5:30 p.m. Mullin then questioned appellant and obtained a fuller statement which appellant refused to sign. When Mullin came out of the interrogation room, Mr. Vivian had arrived and was waiting, angry and shouting that he was going to get a lawyer. He had already called the family attorney, who was out. Mr. Vivian was ordered out of the police station when he refused to calm down. He returned and, with his wife, talked to their son for about 15 minutes. Shortly afterwards, appellant was taken to the 7th District Station and "slated" at 7:40 p.m. At no time up to then had appellant asked for an attorney; nor had an attorney called or appeared at the police station. The two oral admissions, one made to Fleming sometime between 4:30 and 5:30 p.m. and the other, consistent with the first, made to Mullin at about 5:30 p.m., are the statements appellant claims should have been excluded.

We agree with the lower court that the oral statements were properly admitted. Judge SPAETH perceptively analyzed this question in his opinion, written before the most recent United States Supreme Court decisions, *Miranda v. Arizona,* 384 U.S. 436, 86 S. Ct. 1602, 16 L. ed. 2d 694 (1966), and *Johnson v. New Jersey,* 384 U.S. 719, 86 S. Ct. 1772, 16 L. ed. 2d 882 (1966). These recent decisions do not change the result. In *Johnson v. New Jersey,* supra, the Court held that *Mi-*

*randa v. Arizona,* supra, was to be applied only to cases in which trial began after June 13, 1966, the date of the *Miranda* decision. Thus *Miranda,* which would be favorable to appellant's argument, does not help appellant, whose trial was held in August, 1965.

In *Johnson v. New Jersey,* supra, the court also held that the holding of *Escobedo v. Illinois,* 378 U.S. 478, 84 S. Ct. 1758, 12 L. ed. 2d 977 (1964), is available only to persons whose trials began after June 22, 1964, the date on which *Escobedo* was decided. Thus appellant with his 1965 trial date must rely on *Escobedo* in his confession argument.[1]

The holding of *Escobedo v. Illinois,* supra, is that "where the investigation is no longer a general inquiry into an unsolved crime but has begun to focus on a particular suspect, the suspect has been taken into police custody, the police carry out a process of interrogations that lends itself to eliciting incriminating statements, the suspect has requested and been denied an opportunity to consult with his lawyer, and the police have not effectively warned him of his absolute constitutional right to remain silent, the accused has been denied 'the assistance of counsel' in violation of the Sixth Amendment to the Constitution as 'made obligatory upon the States by the Fourteenth Amendment' (citing Gideon v. Wainwright), and that no statement elicited by the police during the interrogation may be used against him at a criminal trial." Judge SPAETH points out in his opinion, and we agree, that when appellant confessed to his mother and Detective Fleming, he was an accused; Mullin had already gone to obtain an arrest warrant. Thus appellant comes within the first requirement for the application of the *Escobedo* rule, viz., that the process had shifted to the accusatory stage.

---

[1] Appellant makes no claim before this court that his confessions were involuntary.

Here, however, is where the situation in *Escobedo* begins to differ from this case. Unlike in *Escobedo,* where the defendant repeatedly asked during the course of the interrogation to speak to his lawyer, who was in another room of the police station asking and being denied permission to see his client, Vivian never asked to speak to a lawyer at the police station.[2] When given the chance to call a lawyer, soon after being picked up at the golf course, Vivian called his mother who contacted the family attorney. The attorney's advice to the mother was "not to worry about it . . . it was just a routine investigation." Also unlike *Escobedo,* who saw no one except his interrogators during the night-time questioning, Vivian consulted alone with his mother for about a half hour prior to giving any incriminating statement. His mother had already spoken twice to the family attorney, who twice tacitly consented to the questioning and made no effort to either call or go to the police station although he knew that Vivian was in police custody. His mother also cautioned Vivian several times not to give any written state-

---

[2] We are aware that our Supreme Court decided in *Commonwealth v. Negri*, 419 Pa. 117, 122, 213 A. 2d 670 (1965), filed on September 29, 1965, after the date of the trial in this case, "to accept and follow the decision of the Third Circuit (in United States ex rel. Russo v. New Jersey, 351 F. 2d 429 (1965)), until some further word is spoken by the Supreme Court of the United States." The Third Circuit in *Russo* held that no request by the accused is necessary to impose upon the interrogating police the duty to furnish the assistance of counsel at the accusatory stage in the absence of an intelligent and understanding waiver. Since the Supreme Court of the United States spoke further on the subject on June 20, 1966, in *Johnson v. New Jersey*, supra, deciding that *Miranda v. Arizona*, supra, whose guidelines include the rules set forth in *Russo*, should be prospective only and on June 21, 1966, vacating the judgment in *Russo*, we doubt that our Supreme Court will hold that the *Russo* rules should be applied in Pennsylvania to cases where the trial began before June 13, 1966, the date of *Miranda*.

ments. It was only after this half-hour private discussion with his mother, and only after a detective friend of the mother's spoke briefly to Vivian, with the mother's consent, that Vivian admitted the beating to the detective and Mrs. Vivian. The picture presented is not that of incommunicado interrogation or of overbearing police tactics or of deprivation of or disobedience to an attorney's advice. Vivian's attorney was never prevented from seeing or speaking to his client. Vivian's mother, who had twice talked to an attorney, was at the police station and talked to him so that Vivian no doubt knew what his attorney told his mother. His confessions,[3] given only after his mother agreed that Fleming should talk to him, are not constitutionally tainted by reason of the fact that an attorney was not physically present and appellant was not formally advised by the police of his right to remain silent.

## II.

Appellant also contends that he was denied his constitutional right to counsel when, just prior to cross-examination, the court instructed him not to discuss his testimony with counsel during the luncheon recess.

On the fourth and last day of testimony, appellant testified in his own behalf. His direct examination was concluded about 12:30 p.m., whereupon the following appears in the record:

"THE COURT: All right. He will remain in the police officer's custody during the recess. He cannot be permitted to see you.

---

[3] Nothing happened between the first confession to Fleming and the second more detailed oral statement to Mullin, both of which were given before Vivian's father arrived and talked to his son, to render the second one unconstitutionally obtained.

"Mr. PAUL: Oh, I realize that, sir, and I will tell the parents not to talk to him, either, sir.

"THE COURT: Well, they will not be permitted to see him. Mr. Vivian, I am going to release you to the custody of the court officer but you are not to discuss, either with them or with anyone, this case. You are about to be under cross-examination. We will take a recess until quarter of two."

Court recessed for lunch at 12 :40 p.m. and resumed at 1 :45 p.m.

Appellant contends that this action of the lower court brings this case within our holding in *Commonwealth v. Werner,* 206 Pa. Superior Ct. 498, 214 A. 2d 276 (1965), allocatur refused,     Pa. Superior Ct.     , and *Commonwealth v. Peetros,* 206 Pa. Superior Ct. 503, 214 A. 2d 279 (1965), allocatur refused,     Pa. Superior Ct.     , requiring us to grant a new trial. We cannot agree.

The basis for the *Werner* decision, followed in its companion case, *Peetros,* was our view that the constitutional right to the assistance of counsel prohibits a trial judge from interfering with an attorney's desire to effectively prepare and present his client's case by limiting the subject matter which an attorney may discuss with his client. In both cases trial counsel was told that he could confer with his client, the defendant, during the overnight recess, but that he could not discuss his testimony with him. We held that the right to the assistance of counsel included the right of a defendant in a criminal trial to discuss with his attorney any matters pertaining to the case, including his own testimony.

In the case at bar there was no judicial interference with any attorney's desire to prepare and present his client's case by limiting the subject matter to be discussed. Defense counsel gave no indication that he wanted to spend time during the lunch hour to discuss

any part of the case with his client. Appellant gave no indication that he wanted or needed to talk to his attorney over the lunch hour. The trial judge, charged with insuring the orderly conduct of the trial, left appellant in the custody of a police officer, who was responsible for returning appellant at 1:45 p.m., leaving only sixty-five minutes to order and eat lunch and get back to the courtroom. In the *Werner* case there was no valid reason for the restriction imposed for a seventeen hour period while here it appears that all parties concerned recognized the need to use the limited time set aside for lunch to nourish and refresh themselves rather than to discuss the case. Under the circumstances of this case we are satisfied that appellant was not deprived of his constitutional right to the assistance of counsel during trial.

## III.

Appellant's third argument is that his constitutional right not to incriminate himself was violated by the "lineup" in which he was identified in the Carfagno boy's hospital room. This argument lacks supporting authority.

Appellant cites *Butler v. Crumlish,* 229 F. Supp. 565 (E.D. Pa. 1964), in which the court held that there was sufficient merit to grant a preliminary injunction in the argument, advanced by two prisoners unable to post bail, that their involuntary line-up would constitute a violation of *the equal protection* clause because other accuseds out on bail were not subjected to such treatment. That case is not authority for appellant's *self-incrimination claim* and its equal protection holding was repudiated by the Third Circuit in *Rigney v. Hendrick,* 355 F. 2d 710 (1965).

Since that time the United States Supreme Court, as well as several other courts, has spoken on the sub-

ject adversely to appellant's claim. In *Schmerber v. California*, 384 U.S. 757, 86 S. Ct. 1826, 16 L. ed. 2d 908 (June 20, 1966), the Court quoted Mr. Justice HOLMES in *Holt v. United States*, 218 U.S. 245, 254 (1910) : "(T)he prohibition of compelling a man in a criminal court to be a witness against himself is a prohibition of the use of physical or moral compulsion to extort communications from him, not an exclusion of his body as evidence when it may be material."

The Second Circuit, in a recent similar hospital room identification situation, rejected a self-incrimination argument in *U. S. ex rel. Stovall v. Denno*, 355 F. 2d 731 (1966). In an excellent opinion Judge MOORE reviews numerous cases dealing with this question.

Appellant's constitutional argument on this point, which seeks to avoid the distinction between bodily view and compelling an accused to communicate or testify against himself, must be rejected.

Appellant's argument that certain testimony regarding the identification was hearsay need not be considered by this court since it was not raised in the court below and was not included in the statement of questions in this appeal. Furthermore an examination of the trial record convinces us that the admission of the testimony, if error at all, was not basic and fundamental error.

## IV.

Appellant's final argument is that he was denied due process of law by the manner in which he was sentenced by the lower court. On February 14, 1966, Judge SPAETH suspended sentence on all bills of indictment and placed Vivian on probation for five years on Bill 667 (the Carfagno beating) and a total of two additional years on the remaining four bills, to which appellant had plead nolo contendere. On February 23,

1966, within the same term of court and after receiving two long and detailed psychiatric reports, Judge SPAETH modified the order of February 14th and imposed a sentence of one to four years on Bill 667 and six months to one and one-half years on each of the other four bills to be served consecutively, a total of three to ten years.

Appellant contends that this modification subjected him to double jeopardy for the same offense, contrary to the Fifth Amendment of the United States Constitution and Article I, Section 10 of the Pennsylvania Constitution. We need not reach appellant's constitutional argument[4] because he was not placed in jeopardy a second time.

The Act of June 19, 1911, P. L. 1055, §1, as amended, 19 P.S. §1051, which authorizes suspension of sentence in certain cases, provides that the court "shall

---

[4] Appellant urges us to hold that the Fifth Amendment's double jeopardy provision, as interpreted in the federal courts, is binding on the states through the Fourteenth Amendment's Due Process clause, thus overruling decisions such as *Commonwealth ex rel. Berry v. Tees*, 177 Pa. Superior Ct. 126, 110 A. 2d 794 (1955), and *Commonwealth ex rel. Young v. Day*, 180 Pa. Superior Ct. 276, 119 A. 2d 559 (1956), where we held that a court has the power to change a sentence, increasing or reducing the punishment, at any time during the term of court in which it was imposed so long as the sentence has not been fully executed, and applying the term "double jeopardy" to noncapital offenses contrary to *Commonwealth v. Simpson*, 310 Pa. 380, 165 A. 498 (1933), *Commonwealth v. Baker*, 413 Pa. 105, 196 A. 2d 382 (1964), and numerous other cases. We note that the United States Supreme Court has not, to this time, adopted this argument. See *Hoag v. New Jersey*, 356 U.S. 464, 78 S. Ct. 829, 2 L. ed. 2d 913 (1958); *Bartkus v. Illinois*, 359 U.S. 121, 79 S. Ct. 676 (1959); *Brock v. North Carolina*, 344 U.S. 424, 73 S. Ct. 349 (1953); and *Palko v. Connecticut*, 302 U.S. 319, 58 S. Ct. 149 (1937). However, in *Cichos v. Indiana*, 208 N.E. 2d 685 (Ind. 1965), cert. granted, 34 U.S. Law Week 3339 (April 4, 1966), the Supreme Court will have an opportunity to reconsider *Palko* and this line of cases.

have power to suspend the imposing of the sentence, and place the defendant on probation for a definite period." See also the Act of August 6, 1941, P. L. 861, §25, 61 P.S. §331.25, authorizing probation instead of sentence. When a defendant is placed on probation, he is not sentenced. *Commonwealth v. Ferguson,* 201 Pa. Superior Ct. 649, 193 A. 2d 657 (1963), *Commonwealth ex rel. Champion v. Claudy,* 171 Pa. Superior Ct. 143, 90 A. 2d 638 (1952). Thus the order of February 14th, suspending sentence and placing appellant on probation, was not a sentence. Under the rule of *Commonwealth ex rel. Farrow v. Martin,* 387 Pa. 449, 127 A. 2d 660 (1956), that a defendant who has been convicted cannot be placed in double jeopardy for the same crime until he has been legally sentenced, this appellant's original jeopardy continued until February 23, 1966, the date of his first sentence, and there was no double jeopardy.

Seeing no constitutional infirmities in appellant's trial and sentencing, we affirm the judgment of the lower court.

Judgments of sentence affirmed.

HOFFMAN, J., took no part in the consideration or decision of this case.