UNITED STATES of America, Plaintiff,

v.

Rafael G. PEÑA, Defendant.

Civil Action No. 95–20051–03.

United States District Court,
D. Kansas.

March 22, 1996.

Kurt D. Marquart, Kansas City, MO, Stephen G. Ralls, Tucson, AZ, for defendant.

Kim Martin Fowler, Office of United States Attorney, Kansas City, KS, for U.S.

## MEMORANDUM AND ORDER

EARL E. O'CONNOR, District Judge.

This matter is before the court on defendant Raphael Peña's motion to dismiss the indictment based on double jeopardy grounds (Doc. # 187). Defendant maintains that his criminal prosecution in federal court, following civil forfeitures of property in state court, constitutes a successive effort to impose punishment for the same offense, in violation of the Double Jeopardy Clause of the Fifth Amendment to the United States Constitution. The indictment charges defendant with narcotics offenses arising from the same conduct that gave rise to the forfeiture proceedings.

The government contends that the "dual sovereignty doctrine" applies, and thus a subsequent federal prosecution does not violate the Double Jeopardy Clause. Under the "dual sovereignty doctrine," successive prosecutions based upon the same conduct are permissible if brought by separate sovereigns. In response, defendant asserts that the facts and circumstances surrounding the federal prosecution indicate that it was actually an otherwise impermissible second state prosecution, and thus falls within the *Bartkus* exception to the dual sovereignty doctrine.

In *Bartkus v. Illinois*, 359 U.S. 121, 79 S.Ct. 676, 3 L.Ed.2d 684 (1959), the Supreme Court noted that successive state and federal prosecutions are constitutionally permissible because every citizen of the federal government is also a citizen of a state, and both sovereigns have authority to punish individuals for infractions of the law. *Id.* at 131–32, 79 S.Ct. at 682–83. The court observed that the successive prosecutions before it did "not sustain a conclusion that the state prosecution was a sham and a cover for a federal prosecution, and thereby in essential fact another federal prosecution." *Id.* at 124, 79 S.Ct. at 678.

A number of courts since the *Bartkus* decision have inferred from that case that collusion between federal and state authorities could bar the second prosecution. *See United States v. Moore*, 822 F.2d 35, 38 (8th Cir.1987); *United States v. Aboumoussallem*, 726 F.2d 906, 910 (2d Cir.1984); *United States v. Aleman*, 609 F.2d 298, 309 (7th Cir.1979), *cert. denied*, 445 U.S. 946, 100 S.Ct. 1345, 63 L.Ed.2d 780 (1980); *United States v. Liddy*, 542 F.2d 76, 79 (D.C.Cir. 1976). *But see United States v. Brocksmith*, 991 F.2d 1363, 1366 (7th Cir.), *cert. denied*, — U.S. ——, 114 S.Ct. 569, 126 L.Ed.2d 468 (1993) (questioning whether such an exception exists); *United States v. Patterson*, 809 F.2d 244, 247 n. 2 (5th Cir. 1987) (same). "When a defendant claims that federal and state officials are not acting as dual sovereigns, he has a substantial burden of proving one sovereign is so dominated by the actions of the other that the former is not acting of its own volition." *United States v. Raymer*, 941 F.2d 1031 (10th Cir.1991) (citing *United States v. Liddy*, 542 F.2d 76, 79 (D.C.Cir.1976)).

The Tenth Circuit alluded to the existence of the *Bartkus* exception in *United States v. Raymer*, 941 F.2d 1031 (10th Cir.1991), wherein the court stated: "A possible exception to the dual sovereignty rule might exist where a federal or state prosecution was merely a tool manipulated by the other sovereign to revive a prosecution barred on federal constitutional grounds." *Id.* at 1037 (citing *Bartkus*, 359 U.S. at 123–24, 79 S.Ct. at 678–79). In *United States v. Fuentes*, 978 F.2d 1268, 1992 WL 314097 (10th Cir.1992), *cert. denied*, 507 U.S. 965, 113 S.Ct. 1398, 122 L.Ed.2d 771 (1993), the Tenth Circuit more explicitly recognized the *Bartkus* exception in the following language: "To avoid application of the dual sovereignty doctrine, a defendant must prove that one sovereign so dominated the actions of the other that the latter was not acting independently." *Id.* at *2 (citing *Raymer*, 941 F.2d at 1037).

On December 21, 1995, we issued an opinion wherein we granted defendant's request for an evidentiary hearing to determine whether the facts surrounding defen-

dant's prosecution justified application of the *Bartkus* exception. *United States v. Peña,* 910 F.Supp. 535 (1995). On January 18, 1996, an evidentiary hearing was held. The court allowed defendant to present evidence on the limited issue of whether the federal government was operating as a tool of the state, or was engaged in a sham prosecution for the state. In our decision, we enumerated the "specifically-tailored areas of inquiry," or "factors," which courts have deemed relevant in evaluating the extent of federal involvement:

In resolving the applicability of the *Bartkus* exception, other courts have allowed fact-finding on specifically-tailored areas of inquiry. For example, in *United States v. All Assets of G.P.S.,* 66 F.3d [483] at 496, [ (2d Cir.1995) ] the court held that additional fact-finding was necessary on the following:

. . . .

Specifically, we do not think we can resolve the applicability of the *Bartkus* exception without additional fact-finding concerning the expected proceeds of the forfeiture, the extent, cost, and value of the labor and services provided by state officials in the federal action, and the bargain between federal and state authorities as to the split of the proceeds.

Once the District Court has found these facts, it should in their light, reconsider the other factors, *e.g.,* who initiated the forfeiture action and what was the role of the deputized state prosecutor—that it properly held did not by themselves implicate the Bartkus exception. It must then conclude whether, taken all together, these factors amount to appropriate cooperation or to inappropriate use of one sovereign by another.

The Tenth Circuit, in *United States v. Raymer,* 941 F.2d at 1039, indicated that the following factors could be considered in evaluating the extent of independent federal involvement: (1) whether the federal prosecution involved substantial investigation separate and apart from the state charges; (2) whether the federal designation of a state prosecutor was appropriate to vindicate the substantial federal interest implicated by the scope of the alleged criminal activity; (3) whether the federal government paid for the cost of prosecution; (4) whether lawyers from the Justice Department and the local U.S. Attorney's office worked on the case; and (5) whether any witnesses were unique to the federal prosecution. *See also United States v. Bernhardt,* 831 F.2d [181] at 183 [ (9th Cir.1987) ] (fact several Assistant United States Attorneys may have worked on the Bernhardt prosecution indicated involvement of the federal authorities that may be sufficient to remove case from the *Bartkus* exception). In view of the specific factors which the foregoing courts have considered, we find defendant's requests overbroad and insufficiently tailored to elicit evidence relevant to the limited issue of the applicability of the *Bartkus* exception.

We hold that defendant may present evidence regarding the factors outlined in *Raymer,* as well as those the Second Circuit articulated in *All Assets of G.P.S.,* with one exception: The court is of the view that the cost and value of the labor and services provided by state officials in the federal action, a factor recognized by the court in *All Assets of G.P.S.,* is simply not relevant or material to the court's determination of whether the *Bartkus* exception applies. The amount of money spent by the state in the federal investigation has no direct bearing on the ultimate question of whether the state controlled the federal investigation. The court's determination to exclude from consideration the foregoing factor, however, does not foreclose introduction of evidence regarding the extent of the labor and services provided by state officials. Defendant may present evidence regarding the extent of labor and services without getting into a cost analysis.

910 F.Supp. at 542.

We have carefully examined the transcript and exhibits of the hearing, the arguments of counsel, the briefs, and the applicable law, and are now prepared to rule.

The general factual background of this case is fully set forth in *United States v. Peña,* 910 F.Supp. 535 (1995), and is incorpo-

rated herein. Additional facts pertinent to the issues will be addressed in the discussion of the points raised. We now examine each of the factors, in light of the evidence presented at the hearing, to determine whether "sufficient independent federal involvement exists." *United States v. Bernhardt*, 831 F.2d 181, 183 (9th Cir.1987).

1. *Whether the federal prosecution involved substantial investigation separate and apart from the state charges.*

Peña contends that the investigation of the case was conducted "almost exclusively by the State of Kansas," and points to the following evidence: the early stages of the investigation were conducted by state officers; during the fall of 1994, Detective David Wilson of the Lenexa Police Department sought information about the case from United States Customs Agent William Carroll, and had weekly contact with Carroll thereafter; the "only other" federal officer involved in the investigation was Drug Enforcement Agent Gary Borstelman, who conducted "occasional" file or background checks for Wilson; from November 17, 1994, through May 2, 1995, electronic surveillance (pen registers and wiretaps) was obtained without federal assistance; a federal pen register that was obtained by Assistant United States Attorney Kim Fowler was done so with information provided by state officers; a pen register was installed by Southwestern Bell technicians at the direction of Wilson; during the time the wiretap was in place, it was monitored by state personnel exclusively, with the mechanism for obtaining the outgoing and incoming calls located at the Lenexa Police Department; and Kansas law enforcement officials obtained and served the search warrants in the case, while United States Customs Agent Carroll "may have been the only participating federal officer present during the arrests of the co-defendants."

From this evidence, defendant maintains:
The fact that Agent Carroll might have worked this case in concert with Detective Wilson, does not allow for the conclusion that Agent Carroll's single endeavors compare in any way with the virtual army of state agents who were involved in this case. To elicit information in this manner, represents a purposeful distortion of the fact that the involvement of the state officers in this case outweighs the government's efforts ten-fold and that when so compared, the involvement of Agent Carroll is negligible. As Detective Wilson testified, with the sole exception of Robin Barber of the I.R.S., Agent Carroll was the *only* federal officer who maintained a regular role in this investigation, and as Agent Carroll admitted, he was to [sic] only person from United States Customs Service assigned to this case. Further, Agent Carroll admitted that there were *many* more state officers than federal officers working this case.

In these circumstances, it is clear that the state law enforcement officers conducted and controlled the investigation of this case and that there was no "independent" government investigation.

Peña's Brief, at 11–12.

First, we note that the proper inquiry is whether there is evidence of independent federal *involvement* in the investigation: the test is not, as Peña characterizes it, whether there was an independent federal investigation. Second, we find Peña's focus on a comparison of the relative number of state officers versus federal officers involved in the investigation not determinative of whether the federal government acted independently. Peña cites no authority to support the proposition that a disproportionate number of state officers in the investigation indicates domination and control of the federal prosecution by the state.

■ According to the testimony of United States Customs Agent William Carroll, he was involved in the investigation as a "co-case agent." Carroll worked nearly 800 hours on the investigation, and first "opened a case" in his records in November of 1994. Carroll further testified that federal surveillance equipment and a technician were used during the investigation, along with a Customs Department aircraft and crew which provided "air support on surveillance."

During the course of the investigation, two federal agents (Carroll and Special Agent Robin Barber of the IRS) travelled to Florida with Detective Wilson to interview a witness related to the case. Two federal agents (Carroll and DEA Drug Task Force Agent Borstelman) travelled to Arizona with Wilson to interview witnesses. The federal government paid for Wilson's trip to Arizona. The federal government also obtained a court order for a pen register as part of the investigation of the case. We find such evidence reflects a significant degree of independent federal involvement in the investigation.

2. *Whether the federal designation of a state prosecutor was appropriate to vindicate the substantial federal interest implicated by the scope of the alleged criminal activity.*

■ Sarah Welch, Assistant District Attorney for the State of Kansas, an attorney involved in the state court proceedings, was cross-designated as a Special Assistant United States Attorney to assist Assistant United States Attorney Kim Fowler in the federal prosecution. Peña recognizes that every circuit to date, that has considered the issue, has held that the cross-designation of a state district attorney as a federal prosecutor to assist, or even to conduct, a federal prosecution does not by itself bring a case within the *Bartkus* exception. Instead, Peña argues that "in this case, AUSA Fowler may have been engaged *only* for her knowledge of the federal system and not to secure the vindication of a substantial federal interest." Peña's Brief, at 14 (emphasis in original). As support for this theory, Peña emphasizes the portions of Welch's testimony where she states that until this case, she had never worked on a wiretap or "Title III" investigation as a lawyer, had only worked on one wiretap case as a police officer, and had never drafted a federal indictment or information.

We first observe that the relevant inquiry under this factor is not the reason the federal prosecutor "may have been engaged," but the reason for federal designation of a state prosecutor. The evidence presented demonstrates that Welch, during the course of the investigation, had secured pen registers, prepared affidavits, secured the May 2, 1995, wiretap order, and drafted search warrant affidavits. When asked at the hearing why she was cross-designated, Welch responded "my extensive knowledge of the case and background with it was viewed as something that would be beneficial and expeditious in the prosecution in federal court." In addition, at the hearing, AUSA Kim Fowler was asked the following questions and gave the following answers:

Q. Did you have any role in recommending and getting approval for Sara Welch as a Special Assistant United Sates Attorney?

A. I requested it to the first assistant and the U.S. Attorney at that time.

Q. And why was that?

A. Because this had been a very lengthy investigation. She had been involved from the beginning and it was a wiretap case. She had drafted the applications and orders for the wiretap. She had reviewed the affidavits for wiretap. And then she also—I think she drafted all of the affidavits for the search warrants that were executed.

Q. And with an eight-defendant conspiracy case, did you think it might be helpful in prosecuting the case to have the attorney who had been involved in those matters as an assistant in the case?

A. Yes.

As the state prosecutor most familiar with the facts of the case, and given the nature of the case (a large-scale, multi-defendant drug conspiracy prosecution), the court finds that the cross-designation of Welch was a fitting use of prosecutorial resources, and was appropriate to vindicate the substantial federal interest implicated by the scope of the alleged criminal activity. "Deputizing a state prosecutor may, because of the state's knowledge of the case, be the most efficient way for the federal government to proceed." *All Assets v. GPS*, 66 F.3d at 496. *See also Raymer*, 941 F.2d at 1040–41 (district court found that the cross-designation of state prosecutor was appropriate because of his

familiarity with the defendants and the alleged conspiracies).

### 3. *Whether the federal government paid for the cost of prosecution.*

With respect to this factor, Peña asserts: "the mere fact that Ms. Fowler and others may have been paid by the federal government is not clearly indicative of federal autonomy. In this case, it is the Defendant's contention that the government was to be reimbursed for its expenses through the channelling of asets [sic] from the state civil forfeiture of the co-defendants' assets."

■] The evidence reflects that all federal attorneys and agents who worked on the case were paid by the federal government, and that all state officials were paid by the state government. The only exception was Wilson's trip to Arizona, which was paid for by the Drug Enforcement Administration. Once the case reached federal court, the prosecution was paid for by the federal government, just as in any other federal case. Peña presents no evidence to support his assertion that the federal government's receipt of forfeiture proceeds from certain co-defendants' property was in fact reimbursement for federal expenses, or how such "reimbursement" indicates state manipulation or control of Peña's federal prosecution. We find that this factor weighs in favor of a finding of independent federal involvement.

### 4. *Whether lawyers from the Justice Department and the local U.S. Attorney's office worked on the case.*

■ AUSA Kim Fowler testified that she recommended federal prosecution to First Assistant United States Attorney Jackie Williams, based on several factors, including the large quantity of marijuana involved, the interstate nature of the conspiracy, and the concern that certain defendants might be able to make bond in state court and flee the jurisdiction. The evidence reflects that Kim Fowler did not commit to a federal prosecution early on because she wanted to first determine whether the scope of the conspiracy and amount of drugs involved proved significant enough to warrant federal prosecution. There is no evidence that her decision to wait before initiating federal prosecution was due to a "non-committal and lackadaisical attitude on the part of the federal prosecutor," as Peña suggests. Upon Kim Fowler's recommendation, First Assistant United States Attorney Williams determined that federal prosecution was warranted. There is no evidence that the state exercised significant influence in the United States Attorney's ultimate decision.

AUSA Robin Fowler subsequently filed the information. The evidence reflects that AUSA Kim Fowler was lead counsel at all hearings in the case, except when she was either unavailable in court due to illness in her family, or when she became a witness in the double jeopardy portion of the case. AUSA Kim Fowler testified that she drafted the indictment, handled all plea negotiations with defense counsel, and spent a "significant amount" of her time prosecuting the case. Indeed, Kim Fowler testified that until most of the case was resolved, she spent "the majority" of her time on the case. Welch characterized Kim Fowler as performing the "lion's share" and "75 percent" of the work during the federal prosecution. All plea agreements were approved by Williams.

Peña maintains that "ample evidence demonstrates that ADA Welch was in control at every step ... including ... prosecution.... In addition, the facts demonstrate that there has been virtually no post-indictment autonomy or independent volition on the part of the United States Attorney's Office because there has been significant state activity at every proceeding that calls for decision making." Peña's Brief, at 15, 21. From the facts presented at the hearing, we find such assertions to be completely unsupported by the record and contrary to the evidence.

While the government concedes that there has been consultation and cooperation between state and federal officials on the case, the law is clear that the *Bartkus* exception does not bar cooperation between prosecuting sovereigns. *See United States v. Moore,* 822 F.2d 35, 38 (8th Cir.1987) (*Bartkus* explicitly approved the cooperation between federal and state authorities); *United States v. Aleman,* 609 F.2d 298, 309 (7th Cir.1979),

*cert. denied,* 445 U.S. 946, 100 S.Ct. 1345, 63 L.Ed.2d 780 (1980) ("cooperation between state and federal authorities is a welcome innovation"). The evidence does not support a finding that the federal prosecutorial efforts in Peña's case were insubstantial and were controlled by the state.

5. *Whether any witnesses were unique to the federal prosecution.*

■ The federal indictment added two additional defendants (Gary Harrel and Cynthia Atherton) not charged in state court, as well as several money laundering counts not filed in state court. In addition, the federal indictment broadened the time frame of the conspiracy. A comparison of the witness list filed by the State of Kansas in the state prosecution of Peña (Exh. 401) with the witness list for the federal prosecution of Peña (Exh. 429) reveals five common witnesses, but each list contained witnesses that were not on the other list. We find the evidence does not support Peña's contention that the witness lists indicate a "lack of federal involvement" in the federal prosecution.

6. *Financial arrangements concerning the expected proceeds of the forfeiture, i.e., the bargain between federal and state authorities as to the split of the proceeds.*

This factor, unique to forfeiture cases, concerns the allocation of the forfeiture proceeds between state and federal authorities. In *United States v. All Assets of G.P.S. Automotive Corporation,* 66 F.3d 483, 496, the court stated:

> If a state prosecutes to conviction and then prevails upon the federal prosecutor to deputize a state district attorney to bring a forfeiture, ostensibly in the name of the United States, but for the sole benefit of the state, the principles behind the *Bartkus* exception would be strongly implicated. In such a case, the federal government would have no interest in the forfeiture proceeding, and would be serving simply as a "tool" for the advancement of the state's interest. The *Bartkus* exception thus seems especially germane whenever the first prosecuting authority is to

receive a disproportionate share of the proceeds of a subsequent forfeiture action to be brought by a different sovereign.

Peña states that the court in *G.P.S.* "found that the existence of a single factor [the allocation of forfeiture proceeds between the sovereigns] could remove a case from the vast majority of cases that do not fit into the *Bartkus* 'narrow exception to the dual sovereignty doctrine.'" Peña completely mischaracterizes the holding in *G.P.S.* There, the Second Circuit, in remanding the case for further fact-finding, held that the court should re-evaluate *all* factors in light of this additional factor, and then determine, "when taken all together," whether the factors "amount to appropriate cooperation or to inappropriate use of one sovereign by another." *G.P.S.,* 66 F.3d at 496.

The facts of the instant case pertinent to the forfeitures are as follows:

On June 12, 1995, defendant was arrested in Kansas City, Missouri, for conspiracy to sell marijuana. At the time of his arrest, the United States Customs Service seized from defendant a 1990 Wabash National box trailer, a 1989 Kenworth tractor, a 1979 Great Dane low boy trailer, and certain monies.

On June 20, 1995, the United States Department of the Treasury, through the United States Customs Service, served the defendant with a document entitled "Notice of Seizure and Information for Claimants." The property described in the notification included defendant's Kenworth tractor, low boy trailer, and box trailer. Thereafter, defendant served the United States Customs Service with a "Petition for Remission or Mitigation of Forfeiture," seeking the return of all items listed in the notification.

On August 16, 1995, the United States Customs Service informed defendant that his Petition for Remission or Mitigation had been forwarded to Assistant District Attorney Sarah Welsh of the Johnson County District Attorney's Office, because U.S. Customs no longer had custody of the items seized. The Customs Service advised defendant that the box trailer, Kenworth tractor, and low boy trailer had been turned over to the Lenexa Police Department.

On August 24, 1995, the Kansas Department of Revenue notified the defendant that, pursuant to K.S.A. 79–5201 *et seq.*, the Director of·Taxation had assessed against the defendant (1) taxes of $158,900.00 on the marijuana; and (2) a penalty in the sum of $158,900.00 for failure to have Kansas drug tax stamps affixed to the marijuana. On October 24, 1995, defendant entered into a settlement with the Kansas Department of Revenue regarding the defendant's tax liability. Pursuant to the settlement, defendant agreed to forfeit to the Department of Revenue the 1979 Great Dane low boy trailer, the 1989 Kenworth tractor, $210.00 in money orders, and the sum of $273.75, in full and final satisfaction of the $317,800.00 tax assessment against him.

On September 25, 1995, the State of Kansas filed a "Notice of Pending Forfeiture" in the District Court of Johnson County, Kansas. The Notice advised defendant that the 1990 Wabash box trailer had been seized for forfeiture and was pending forfeiture to the ·Lenexa Police Department pursuant to the Kansas Standard Asset Seizure and Forfeiture Act. Defendant then began settlement negotiations with the State of Kansas. As a result of the settlement negotiations, defendant and the State of Kansas entered into a "Stipulated Forfeiture Settlement and Release," wherein defendant agreed to forfeit the 1990 Wabash box trailer, $3,410.00 in U.S. Currency, and 2,130 Nuevos Pesos· to the Lenexa Police Department.

Defendant urges this court to find a double jeopardy violation based on the following actions of the state and federal governments:

At the time of arrest, and in·the days that followed, state police seized in excess of $275,000.00 in U.S. Currency and a vast array of property from the co-defendants in this case. While the division of this property was to be controlled by Kansas statute, there exists evidence to establish that certain property was transferred to the federal government. Page four (4), subparagraph ·(b)(1) of the Goble Plea Agreement dictates that "Defendant agrees to forfeit to the United States ... Lot 6, El Tampa acres First Edition, A subdivision in Camden County, Missouri, ..." In addition, the federal agencies will receive a 1995 Chevrolet pickup, three (3) 1991 Mercury Marquis', [sic] a 1994 ·Ford F–150 pickup truck.

... It is Defendant Peña's contention however, that the distribution agreement involving the federal government, listed above, is firm evidence of the fact that there existed an agreement between the Kansas state agencies and the federal government. While the defense attempted to extricate the terms of this agreement from the witnesses called at the hearing on this matter, none were aware of the existence of a written agreement, and it is possible that this agreement was never reduced to a writing. Nonetheless, someone, somewhere, discussed and agreed to this distribution or it simply. would not exist. Defendant Peña further asserts that, by virtue of its existence, this distribution provides tangible evidence of the fact that the federal government was provided valuable tangible assets in exchange for the prosecution of the co-defendants in this case. . . .

The evidence in this case may demonstrate that the federal government has received a disproportionate share of the state forfeiture proceeds, particularly in light of its limited involvement in the underlying investigation. Because the defendant has been precluded from engaging in an analysis of the costs and benefits accrued to the· federal government,[1] the defense calls upon this Court to view the existence of the federal criminal proceeding following a state/federal forfeiture action in which the federal government has been an ultimate

---

1. Peña mischaracterizes the court's previous opinion. In *U.S. v. Peña,* 910 F.Supp. 535 (1995), the court stated that the cost and value of the labor and services provided by state officials in the federal action, a factor enunciated in *G.P.S.,* was not relevant and would not be ·considered. The court, however, did not foreclose consideration of the extent of the labor and services provided by state officials, and did not preclude defendant from engaging in an analysis of the *benefits* accrued to the federal government: the allocation of forfeiture proceeds between the sovereigns is a factor the court· determined should be considered. *Id.·*at 542.

beneficiary, as a violation of the Double Jeopardy Clause.

Peña's Brief, at 30–31.

Welch testified that of the property seized pursuant to the investigation, certain property would be distributed to four police agencies within the state of Kansas, while other property was to be distributed to various federal agencies. Specifically, the United States Customs Service was to receive four vehicles, the IRS was to receive one vehicle, and the federal government was to receive the interest in Bert Goble's lake house near Osage, Missouri, which was the subject of a federal criminal forfeiture action against Goble. At the time of the hearing, the federal government had not yet received any of the property. None of the property that the federal government was to receive belonged to Peña.

■ The court finds that the facts surrounding the allocation of the forfeiture proceeds do not support Peña's position that the federal government colluded with the state, allowed the state to control the federal prosecution, and in exchange, was paid for the use of the federal forum through receipt of five vehicles. Peña's assertions are nothing more than sheer surmise and speculation. That "someone, somewhere" may have agreed to this distribution of proceeds is certainly not sufficient evidence for Peña to meet his substantial burden. Plaintiff has pointed to no evidence to demonstrate that the distribution of the forfeiture proceeds was part of some "sham," or "cover" for a state-manipulated or controlled prosecution in federal court.

The court has also considered the other points raised by Peña, i.e., the language contained in the plea agreements of the other co-defendants, the timing of the criminal prosecution and the civil forfeiture actions, and the property forfeited by the other co-defendants. Their relevancy with respect to the issue of whether there was collusion in the prosecution of this defendant is tenuous at best. Moreover, the arguments do not persuade us that the overall facts bring this case within the Bartkus exception.

7. *The extent of the labor and services provided by state officials in the federal action.*

■ As we previously discussed in the context of the fourth factor, Sara Welch, the state prosecutor cross-designated in the case, testified that AUSA Kim Fowler performed the "lion's share" and "seventy-five percent" of the work on the federal prosecution. While Fowler testified Welch was "helpful" in the federal prosecution because Welch had been involved in the investigation from the beginning, we do not find the extent of labor and services provided by Welch in the federal prosecution translates into a conclusion that the state controlled or manipulated the federal prosecution. Nor has Peña presented any evidence regarding the extent of labor and services provided by other state officials during the federal prosecution which, when viewed in conjunction with Welch's involvement, would indicate state control or manipulation of the federal prosecution.

■ In sum, we conclude that the evidence simply does not support defendant's allegations of a federal prosecution dominated and manipulated by state officials. Indeed, we find the degree of independent federal involvement in this case to be far greater than that in *Raymer*, 941 F.2d 1031 (10th Cir.1991), *U.S. v. Padilla*, 589 F.2d 481 (10th Cir.1978), or *Bernhardt*, 831 F.2d 181 (9th Cir.1987). The burden of establishing that state officials are controlling or manipulating the federal processes is substantial: the defendant must demonstrate that the state "effectively manipulated the actions of the [federal government] so that [the federal government] officials retained little or no independent volition [in the federal proceedings]." *See United States v. 38 Whalers Cove Drive*, 954 F.2d 29, 38 (2nd Cir.), *cert. denied*, 506 U.S. 815, 113 S.Ct. 55, 121 L.Ed.2d 24 (1992). *See also United States v. Liddy*, 542 F.2d 76, 79 (D.C.Cir. 1976). Based on the evidence presented, we cannot conclude that defendant has met this substantial burden.

Under all the facts and circumstances, the court concludes that this case does not come within the *Bartkus* exception. Accordingly, defendant Rafael G. Peña's motion to dismiss

based on double jeopardy grounds (Doc. # 187) should be and hereby is denied.

If this ruling is not appealed, *Abney v. United States*, 431 U.S. 651, 97 S.Ct. 2034, 52 L.Ed.2d 651 (1977), trial is set for April 22, 1996, at 10:00 a.m.

IT IS SO ORDERED.